UNITED STATES of America, Plaintiff,

v.

WESTINGHOUSE ELECTRIC CORPO-RATION, Mitsubishi Electric Corpora-tion, and Mitsubishi Heavy Industries, Ltd., Defendants.

No. C–70–852 SAW.

United States District Court,
N. D. California.

Oct. 20, 1978.

Anthony E. Desmond, Bernard H. Meyers, Antitrust Div., Dept. of Justice, San Francisco, Cal., for plaintiff.

Moses Lasky, Charles B. Cohler, Robert M. Chilvers, Brobeck, Phleger & Harrison, San Francisco, Cal., for Westinghouse; Frank W. Gaines, Jr., Pittsburgh, Pa., of counsel.

Russell Baker, Hoken S. Seki, Baker & McKenzie, Chicago, Ill., James K. Haynes, Tower C. Snow, Jr., Orrick, Herrington, Rowley & Sutcliffe, San Francisco, Cal., for Mitsubishi defendants.

## FINDINGS, CONCLUSIONS AND ORDER OF DISMISSAL

WEIGEL, District Judge.

In this case the United States of America seeks declaratory and injunctive relief against Westinghouse Electric Corporation (Westinghouse), Mitsubishi Electric Corporation (Melco), and Mitsubishi Heavy Industries, Ltd. (MHI), for alleged violations of Section 1 of the Sherman Act between an unspecified date in 1965 and April 22, 1970, the date of filing. Section 4 of the Sherman Act, 15 U.S.C. § 4 (1976) establishes jurisdiction.

The relationship between Westinghouse and the Mitsubishi defendants and their predecessors extends back more than fifty years. Prior to World War II they were parties to a contract whereby Westinghouse supplied technical and manufacturing information in exchange for royalties on the sale of resulting products. The predecessors of the Mitsubishi defendants were permitted to sell the products only in Japan and China. The contract was interrupted by World War II. After the War, the United States sought ways to help Japan to redevelop her economy. Westinghouse and other corporations were urged to share their technological advances with Japanese industry. As a part of this effort, Westinghouse entered into the first of several technical assistance agreements with Melco in 1951 and with a predecessor of MHI in 1952.[1]

The post-war agreements licensed Melco and MHI to manufacture, use and sell certain products under Westinghouse patents, except in the United States and Canada.[2] The agreements reciprocally authorized Westinghouse to manufacture, use and sell, except in Japan, products incorporating patents and know-how transferred from Melco and MHI.[3]

The Government contends that because of the conduct of defendants and the territorial restrictions in the agreements, the exchange of information constituted an unlawful conspiracy to divide and allocate the world market. The Government contends that Westinghouse also violated Section 1 of the Sherman Act by requiring Melco and MHI to pay royalties on products not incorporating transferred patent technology, and by coercing Melco and MHI into illegal tying arrangements.

The United States asks for judgment declaring that the defendants are in violation of Section 1 of the Sherman Act and for injunctive relief to restore competitive con-

---

1. See Government Exhibit (hereafter "GX") Nos. 8, 39.

2. See GX Nos. 14, 15, 22, 23, 25, 27, 41, 43, 58, 59, 61, 67, 76–78, 81, 95, 102–04.

3. A 1967 contract with MHI allowed Westinghouse unlimited license even in Japan. See GX No. 95, at pp. W4708–09.

ditions among the defendants. The United States further requests that the Court order defendants: (1) to terminate the technical assistance agreements; (2) to grant each other, for a reasonable time and under reasonable royalties, nonexclusive licenses on products covered by their respective patents and by their challenged agreements; and (3) to agree not to enforce any rights relating to technology transferred under the agreements.

After presentation of the Government's case in chief, defendants moved for dismissal under Fed.R.Civ.P. 41(b). All parties submitted extensive briefs. Although much of the Government's evidence has been challenged as inadmissible, defendants have stipulated that all such evidence may be considered for purposes of the present motion.[4]

The Government contends that the Court must decide against defendants if the evidence establishes no more than a prima facie case. The contention is not well taken. The language and history of Rule 41(b) establish that the Court is not compelled to deny a motion to dismiss, merely because the evidence viewed in a light most favorable to the plaintiff, is sufficient to make out a cause of action. Rather, in ruling on a motion to dismiss in a nonjury case, the court must resolve conflicts of evidence and credibility. Advisory Committee on Rules for Civil Procedure, Report of Proposed Amendments, 5 F.R.D. 433, 465–66; 9 Wright & Miller, Federal Practice and Procedure, § 2371, at pp. 224–

25 (1971) (citing numerous cases). It is within the discretion of the Court to grant the Rule 41(b) motion if the Government's case is not established, or close to being established, by a preponderance of the evidence. *Southern Arizona York Refrigerator Co. v. Bush Mfg. Co.*, 331 F.2d 1 (9th Cir. 1964); *Ellis v. Carter*, 328 F.2d 573 (9th Cir. 1964).[5]

I

The Government's chief claim is that in exchange for technical "know-how" from Westinghouse, Melco and MHI agreed not to compete with Westinghouse in the United States. The defendants agree, as they must, that market allocations among horizontal competitors are illegal per se under Section 1 of the Sherman Act, *United States v. Topco Associates, Inc.*, 405 U.S. 596, 608, 92 S.Ct. 1126, 31 L.Ed.2d 515 (1972), and that if any of the parties did in fact have a tacit agreement not to compete in the United States, it would constitute a violation as the Government contends. Defendants argue, however, that the agreements do no more than license Melco and MHI to sell products encompassing Westinghouse technology and permit sales throughout the world other than in the United States and Canada. Defendants claim that no agreements, written or tacit, prohibit Melco or MHI from selling other products in the United States and Canada and that any failure of Melco or MHI to sell products in the United States and Canada is

---

4. Tr. p. 1834.

5. However, Westinghouse is incorrect in asserting that the case must be dismissed as moot, even if the Government has established a violation of the Sherman Act, unless a preponderance of the evidence indicates that the violation is continuing or that defendants are reasonably likely to engage in unlawful conduct in the future. Westinghouse's position is based on the mistaken view that the Court lacks power merely to declare that past conduct violated the Sherman Act, because of both the case and controversy limitation of Article III of the Constitution and the terms of the jurisdictional grant of the Sherman Act § 4. The Supreme Court declared in *United States v. W. T. Grant Co.*, 345 U.S. 629, 632, 73 S.Ct. 894, 897, 97

L.Ed. 1303 (1953), that "[v]oluntary cessation of allegedly illegal conduct does not deprive the tribunal of power to hear and determine the case." *See also United States v. Concentrated Phosphate Export Assn., Inc.*, 393 U.S. 199, 203, 89 S.Ct. 361, 21 L.Ed.2d 344 (1968). *W. T. Grant* and *Concentrated Phosphate* further determined that in cases where injunctive relief is inappropriate, defendants' "heavy burden of persuasion" to show mootness could only be met by a demonstration that the allegedly wrongful behavior could not reasonably be expected to recur. On this motion to dismiss, defendants are limited to the Government's evidence. That evidence is insufficient to meet their heavy burden of establishing mootness.

due to the fear that such sales might infringe Westinghouse patents.

■ Although the Government now charges the existence of a trilateral conspiracy among defendants, it was not alleged in the complaint and the evidence fails to establish even a colorable case to support it. The fact that the predecessors of MHI and Melco were contained within one giant holding company prior to World War II, does not show that Melco and MHI are now one company or that they are co-conspirators with Westinghouse. Moreover, nothing in the agenda or reports of meetings attended by any or all of Melco, MHI, and Westinghouse shows any three-party conspiracy.[6] Finally, the Government has shown that there is only one type of product which Melco and MHI made jointly and which was subject to negotiations with Westinghouse.[7] The evidence demonstrates that Melco and MHI each dealt with Westinghouse independently in that regard.[8]

■ The Government's charge of unlawful bilateral conspiracies (between Westinghouse and Melco, and between Westinghouse and MHI) not to compete in the United States is unsupported by a preponderance of the evidence. The first theory propounded in support of this claim is that the parties have tacitly perpetuated the 1923 contract, which apparently divided world markets between Westinghouse and the predecessors of the Mitsubishi defendants.[9] The theory is not borne out by the evidence. None of the provisions of the post-war contracts is unlawful on its face, nor is there evidence of a continuing pattern of conduct among defendants dating back to the pre-war period. At most the Government has shown a general desire for continued cooperation. In fact, the documents cited by the Government show that by 1965 there had been a substantial erosion of the relationship between Westinghouse and Melco and that the parties engaged in very hard bargaining to continue their licensing agreement.[10] Furthermore, even if such a pattern of conduct had been shown, there is no evidence that the *unlawful* terms of the 1923 agreement were followed in the actual practice of the parties between 1923 and 1951.

The Government's second theory is that even if the post-war agreements did not tacitly continue illegal pre-war practices, the post-war contracts themselves contained tacit agreements by defendants not to compete in the United States. The Government has attempted to prove this claim with three types of evidence and argument.[11]

First the Government notes that the 1951 and 1952 contracts provided for payment of royalties by Melco and MHI to Westinghouse only in the countries where Melco and MHI had been granted patent licenses. There was no provision for royalties on sales elsewhere even as to products embodying non-patent technology provided by Westinghouse. The Government contends that this shows that the parties had reason

6. See GX Nos. 1076–83.

7. See Government Evidence Summary § 1.102, at p. 1.38; GX No. 117, Nos. 47–49, 51.

8. See GX No. 117; Government Evidence Summary §§ 2.001, 2.002, at p. 2.02. *Cf.* GX Nos. 1283–1317; 1318–34.

9. See GX Nos. 3, 3A, 4.

10. See GX Nos. 617, 667A, 621, 1072.

11. The Government also presents evidence of Westinghouse attempts to meet and overcome potential foreign competition, primarily from European countries. Government Evidence summary, Part aIF, pp. 1.111–1.119. This evidence is of little or no value in showing the existence of illegal agreements among defendants. It merely shows activities which one would normally expect of a large corporate enterprise with widespread interests.

In addition, the Government charges that Weico, the Westinghouse subsidiary responsible for administering the agreements between Westinghouse and Melco and MHI, had a practice of shielding its files from inculpatory statements. Government Evidence Summary, Part aIG, pp. 1.120–1.27. For example, Westinghouse allegedly selectively "purged" its files of incriminating documents. Even when viewed in the light most favorable to the Government's position, the evidence presented does not establish the existence of a practice of purging or shielding files from incriminating evidence.

to believe that Melco and MHI would limit sales of products employing Westinghouse technology but not patents, to countries where Melco and MHI had patent licenses. Otherwise, it seems to be the Government's reasoning, Westinghouse would have required royalties on such products for countries as to which patent licenses were not granted. Furthermore, although these "defects" were cured by providing for royalties in the 1966 and 1967 contracts, the Government argues, in effect, that this was merely pro forma.

█ The vice in the Government's contention on this score is that the evidence gives rise to competing inferences and the Government has failed to show that it is more probable than not that its claims are correct. A contract expressly drawn to permit sales of products in a finite number of countries and to provide a royalty for those sales need not necessarily contain clauses dealing with sales elsewhere. This is especially true if the parties' basic assumption was that all of the products concerned were subject to a network of patents so that it was improbable that any product could be manufactured simply on the basis of technological information free from any patented process or apparatus. Nor does the contract clause providing that no party is obligated "to apply for, take out, maintain, or acquire any patents in any country," necessarily indicate that the patents were unnecessary to the parties' agreement. Preservation of the right to determine whether a particular new product or design is patentable without fear of a lawsuit simply does not show that patents are "unnecessary" to the contract.

█ Second, the Government relies on evidence which does conclusively establish that Melco and MHI each refrained from selling products falling within the Licensing and Technology Agreements in the United

States and Canada without first obtaining Westinghouse approval.[12] However, the significance of the requests for approval on the question of the existence of an illegal agreement not to compete in the United States depends on the state of mind of Melco and MHI in seeking Westinghouse approval. Melco and MHI argue that they did not act on the basis of an illegal agreement with Westinghouse but rather out of fear of infringing Westinghouse patents. In response, the Government contends that the defense of "patent motivation" should not now be considered by the Court because defendants have the burden of proving it as part of their case. Indeed, in order to avoid any inference favorable to defendants' theory, the Government appears to have attempted to sterilize its evidence by withholding any documents that might support defendants' position even when such documents were referred to in other documents submitted by the Government or were a part of the documents submitted.[13] In addition, the Government has offered other documents in which Melco or MHI sought Westinghouse permission to sell a product in the United States, or in which Westinghouse turned down a request to sell, purportedly for patent reasons, only for the limited purpose of demonstrating that Melco and MHI refrained from dealing in the United States and not for the truth of the rationale asserted in the documents for the failure to trade.[14]

█ There are, however, numerous references to patents, patent licenses, and letters of nonassertion in the Government's own evidence. Indeed, there is direct evidence that Westinghouse holds a substantial number of important foreign and domestic patents on electrical equipment, and of the attempts of Melco and MHI to obtain li-

12. See GX Nos. 117, 334, 336–37, 357–59A, 361–65A, 373–374, 380–84.

13. For examples, see Brief of Defendant Westinghouse Electric Corp. in Support of Motion For Judgment Under Fed.R.Civ.P. Rule 41(b) In Reply To Plaintiff, Nov. 26, 1976, pp. 46–65.

14. See Government's Response to Court's Order (June 8, 1976) That The Government List All Exhibits That Jt Desires To Be Received In Evidence, June 15, 1976, pp. 16–18, 19–26, 31, 32–33.

censes thereunder.[15] Moreover, the formal agreements between Westinghouse and Melco and between Westinghouse and MHI themselves provide a strong inference that patents extend to all licensed products involved in this suit.[16] Furthermore, contrary to the Government's view, the very fact that defendants referred to Westinghouse patents in connection with proposed sales in the United States is direct evidence of the state of mind of the parties regarding patent infringement.[17] Moreover, repeated rejections by Westinghouse of requests for approval on the stated ground of patent infringement would have given Melco and MHI reason to conclude that there were no other restrictions and hence unpatented products could be sold in the United States and Canada. *See* McCormick, Evidence § 249, at pp. 589–90 (2d ed. 1972), *cf. Safeway Stores, Inc. v. Combs*, 273 F.2d 295 (5th Cir. 1960).

■ Since the Government's own evidence thus raises competing inferences of a legitimate "patent motivation", on the one hand, and an illegal agreement, on the other, to explain defendants' conduct, it is the task of the Government, which has the burden of proof, to show that its version of the facts is the more probable. *Interstate Circuit v. United States*, 306 U.S. 208, 221–27, 59 S.Ct. 467, 83 L.Ed. 610 (1939). This the Government has failed to do.

The Government did not attempt to meet the "patent motivation" defense by showing with respect to one or more of the products that any patent claims were so unfounded that no reasonable, competent manufacturer of electrical equipment would have refrained from unlicensed sales in the United States. The Government did seek to establish that MHI and Melco were prohibited by Westinghouse from marketing products which clearly were not subject to Westinghouse patent.[18] But the evidence indicates that whenever it was arguable that products did not utilize Westinghouse patents, such an argument was raised by Melco or MHI and disputed by Westinghouse, and that the parties then engaged in arms length negotiations to resolve the dispute.[19] For example, in one case Westinghouse volunteered a letter of nonassertion;[20] in another, it ultimately withdrew its objec-

---

**15.** See GX No. 8, at p. 7; GX No. 39, at p. 4628; GX No. 58, at p. 4673A; GX No. 67, at p. Melco 03276; GX No. 95, at p. W4698; GX No. 1348, p. 9–10; GX No. 1350, p. 8.

**16.** See *id.*

**17.** Under Federal Rule 801(a), (c), this nonassertive conduct is not hearsay if offered to prove defendants' state of mind at the time of the conduct because the Government has not shown that defendants wrote the documents deliberately to induce others to believe that they acted out of a "patent motivation." See Advisory Committee on the Federal Rules of Evidence, Note on Rule 801, subdivision (a), 34 L.Ed.2d cliv, clv (1970). Thus the Court can properly infer from a request for a patent license or a response denying such a license that the parties involved believed that a valid patent covered or probably covered the product for which the license was sought. See *People v. Barnhart*, 66 Cal.App.2d 714, 153 P.2d 214 (1944); *see also Mutual Life Insurance Co. v. Hillmon*, 145 U.S. 285, 12 S.Ct. 909, 36 L.Ed. 706 (1892).

**18.** See Part E(2) of Government Evidence Summary §§ 1.406–1.409, at pp. 1.87–1.90.

**19.** See, e. g., GX Nos. 410, 468 (Melco assertion that Westinghouse contract does not prohibit United States sales of sewing machine motors which are "entirely our own development."); GX Nos. 474, 481, 485–86 (Melco request for Westinghouse approval for Melco to sell its Micro Television sets in the United States despite uncertainty as to whether the television involved Westinghouse technology); GX Nos. 507–09, 511, 523 (Melco seeking Westinghouse license to sell color televisions in the United States when Melco was not sure whether it had utilized Westinghouse patents and did not want to risk a patent suit). Where the Government did introduce a letter which tends to show that MHI feared that its contract with Westinghouse prohibited United States sales of products developed without Westinghouse technology, see GX No. 637, the Government has failed to offer highly material documents even though the Government was aware of their existence and availability. See GX Nos. 347, 252, 1409; Tr. pp. 1302–03. Without these documents, it would not only be difficult but also unjust to draw any conclusion adverse to Westinghouse.

**20.** See GX No. 469.

tions;[21] and, in a third, it granted a patent license allowing the sale of the product in the United States.[22]

The Government's third, and strongest, set of facts and supporting argument is based upon the claim that defendants and their agents in their day-to-day dealings with each other appeared to assume that Melco and MHI were prohibited by Westinghouse from selling electrical equipment in the United States regardless of patents.[23] The argument relies upon language in communications authored by defendants and their agents. After careful consideration of the statements adduced by the Government in support, the Court finds that the Government failed to establish that it is more probable than not that there was an illegal agreement to divide world markets. As to the large majority of the communications, it is clear that the authors believed that the only prohibition on sales stemmed, not from some secret understanding, but, rather, from the formal agreements between Westinghouse and one of the Japanese defendants granting licenses to sell patented products anywhere in the world but the United States and Canada. Contrary to the Government's assertions, the precise language used by the defendants in their day-to-day dealings is not indicative of an illegal arrangement simply because the word "patent" was not used.[24] It is hardly strange or incriminating for the parties in dealings among themselves or with strangers to say that the agreement "prohibits sale in the United States,"[25] even though a more precise statement would be, for example, that "since our agreement does not give patent licenses for sales in the United States any such sales are, in effect, prohibited because they could result in patent infringement litigation." This is particularly true of those employees and independent marketing agents whose obvious interest is in *whether*, as opposed to *why*, a product can or cannot be sold.[26] Even in those situations in which isolated remarks, removed from context and without reference to related materials, tend to support the Government's position, a close and complete reading of the evidence shows a much different picture.[27]

Indeed, the defendants have demonstrated over and over again their awareness that Westinghouse patents were the barrier to unlimited sale of Melco and MHI goods in the United States and Canada. Thus, in several cases cited by the Government, immediate and direct response from Westinghouse to a request for approval of United States sales was an express waiver of its patent rights.[28] And in other circumstances, Melco's internal memoranda show that the desire for Westinghouse approval of

---

21. See GX Nos. 524–25.

22. See GX No. 680.

23. See Government Evidence Summary, Part a.I.C., pp. 1.49–1.63; Part a.I.E.(3), at §§ 1.410–1.413; Part a.I.E.(4), at §§ 1.423–1.429; Appendix A.

24. For example, a number of letters and cables mentioning "use and sale" licenses are clearly intended to refer to "patent" licenses. Compare, e. g., GX No. 278 with GX No. 281, and GX No. 549 with GX No. 550. There are many examples, both before and after the Government's warning letter of June 8, 1967, where the grant or denial of a "use and sale" license was all that was discussed. See, e. g., GX Nos. 190, 191, 228, 295, 311, 385, 387–89, 394, 395, 400, 435, 437, 440, 554.

25. See, e. g., GX No. 468.

26. See, e. g., GX Nos. 157, 161, 574.

27. For example, the Government refers to a letter from Melco's President to Westinghouse outlining Melco's desire to supply elevators for a Hawaii hotel. The letter states: "I particularly wish to appeal for your special concession on territorial obligation," GX No. 411. The Government fails to cite the Westinghouse response: "I am very pleased to tell you we will not assert our rights under U.S. patents and information." GX No. 412. Similarly, compare GX No. 134 with Tr. 647–48, and GX No. 114 with GX Nos. 347, 342–43, 337, 337A. See also note 19, *supra*. To be sure, these documents, and others, e. g., GX No. 660, could be read both favorably and unfavorably with regard to defendants' intent. However, it is the Government's burden to demonstrate that it is more probable than not that defendants acted in furtherance of an illegal agreement. This it has not done.

28. See, e. g., GX Nos. 412, 426, and 469.

Melco sales was based on Melco concern as to whether the products involved were covered by Westinghouse patents.[29] These statements take on added significance because they were made in 1962 and 1963, long before the Government appears to have challenged the defendants' relationship and when there seemed no special reason "to make a record."[30] The Government's letter to Westinghouse notifying it of the investigation of its foreign licensing practices for possible antitrust violations was dated June 8, 1967.[31]

## II

■ Another Government claim is that it was improper for Westinghouse not only to grant patent licenses for anywhere in the world except the United States and Canada, but as well to grant special patent licenses on a case-by-case, customer-by-customer, basis in the United States and Canada. This claim is premised on the view that Section 1 of the Sherman Act prohibits a patentee from entering into a licensing agreement which does not extend to every location and to every possible sale of the licensed product.

The Government's proposed interpretation of Section 1 of the Act was considered and rejected in *United States v. CIBA GEIGY Corp.*, 440 F.Supp. 1237 (D.N.J.1976). There the patentee had granted the licensee the right to make and sell its product in specialty form only, but not in bulk for sale to others. The court reasoned that a patentee's right to shut off all competition must necessarily include the lesser right to restrict the exercise of the granted privilege so long as the patentee does not attach a condition that enlarges his monopoly beyond that given by the patent statute and the patent itself. *See United States v. E. I. duPont de Nemours & Co.*, 118 F.Supp. 41, 226 (D.Del.1953) (upholding license which limited the licensee's output to a specific quantity), *aff'd* 351 U.S. 377, 76 S.Ct. 994, 100 L.Ed. 1264 (1956); *United States v. Masonite Corp.*, 316 U.S. 265, 62 S.Ct. 1070, 86 L.Ed. 1461 (1942) (holding invalid scheme by which patentee extended patent monopoly by requiring price-fixing arrangement between itself and each of its licensees); *Ethyl Gasoline Corp. v. United States*, 309 U.S. 436, 60 S.Ct. 618, 84 L.Ed. 852 (1940) (holding invalid license which limited those to whom the licensees could sell finished products which contained the patented article).

The reasoning in *CIBA* is especially strong as to the present case because the restrictions based on patent rights there went much farther than those here. In *CIBA*, the restriction barring bulk sales had the effect of protecting the patentee and its licensees from competition from outsiders who could not obtain the product in order to compete for specialty sales to potential customers. But the only competition directly affected by Westinghouse agreements with Melco and MHI is competition from the licensees themselves. The Government has not contended that the limited licenses prevented competition from outsiders. As the Government has itself emphasized, Westinghouse patents are not so controlling as to prohibit competition from unlicensed manufacturers who have been able to develop alternative methods which do not infringe.[32] Furthermore, there is no other evidence that the Licensing Agreements extend the scope of Westinghouse patent monopoly: They neither fix prices, *cf. Hartford-Empire Co. v. United States*, 323 U.S. 386, 65 S.Ct. 373, 89 L.Ed. 322 (1945) (complex cross-licensing and patent-pooling agreement designed to suppress outside competition and fix prices held invalid), nor attempt to extend the life of any patent, *cf. Brulotte v. Thys Co.*, 379 U.S. 29, 32–33, 85 S.Ct. 176, 13 L.Ed.2d 99 (1964) (licenses which, in effect, extended the life of the

---

29. See, e. g., GX Nos. 111, 429, 485–86.

30. See also GX Nos. 426, 429 and 424; 154, 156 and 157; 207 and 216; 318 and 327; 495 and 501; and, 539 and 543.

31. See GX No. 655.

32. See Government Evidence Summary, §§ 1.309–1.312, at pp. 1.70–1.72; § 1.423, p. 1.96, *citing* GX Nos. 1348, 1350–51.

patented monopoly beyond seventeen years held improper).

■ What the Government is really proposing is this: Since all monopolies, including patent monopolies, undesirably limit competition, every patent licensing contract should, if at all possible, be viewed as a "combination in restraint of trade." Taken to its logical limits, this argument would find almost every patent licensing agreement to be illegal. For one example, an exclusive license to manufacture would be invalid as excluding competition from unlicensed manufacturers, or, for another example, any license calling for a royalty which the Government considers too high to allow meaningful competition with the patentee would be prohibited. Indeed, the Government's complaint demands that the Court order "non-exclusive" patent licenses at a "reasonable royalty rate," for such time "as is necessary to restore competitive conditions." This is a demand calculated to alter and substantially reduce the established scope of the patent monopoly. It should properly be addressed to Congress, not to the courts.

### III

Another Government claim is that the defendants had a triparty understanding (or two separate biparty understandings) that Westinghouse would not compete with Melco or MHI in Japan by exporting electrical equipment to that country. The law plainly forbids any such understanding. *Timken Roller Bearing Co. v. United States*, 341 U.S. 593, 71 S.Ct. 971, 95 L.Ed. 1199 (1957). Therefore the Court must determine whether the Government's charge is supported by a preponderance of the evidence.

As noted earlier in this opinion, the complaint does not charge, nor does the evidence establish, a trilateral conspiracy or agreement. Indeed, the Government's brief fails even to refer to any evidence of a trilateral conspiracy.

The claim of bilateral conspiracies between Westinghouse and Melco and between Westinghouse and MHI arises from the same contracts and relationships between Westinghouse and each of the Japanese defendants considered earlier in this. opinion. The 1923 agreement gave an exclusive license to the Japanese company to manufacture in Japan under Westinghouse patents and limited Westinghouse exports of competing products into Japan.[33] The post-World War II agreements only provided Melco and MHI with an exclusive license to *manufacture* Westinghouse goods in Japan, with Westinghouse expressly reserving the right to sell its equipment there.[34] The post-war agreements also gave Westinghouse nonexclusive licenses under Melco and MHI patents and know-how to manufacture, use and sell products in all countries other than Japan.[35]

■ The grant of exclusive manufacturing rights in Japan, alone, does not violate Section 1 of the Sherman Act. While the arrangement might have had some remote or trivial impact on the United States economy, this is not enough to make it illegal. *Timberlane Lumber Co. v. Bank of America, N. T. & S. A.*, 549 F.2d 597, 613 (9th Cir. 1976), holds that United States antitrust laws are implicated only where the actual or intended effect of a foreign transaction is sufficiently large to cause a cognizable injury to United States commerce. The Government has presented no evidence that United States commerce was restrained by the mere agreement by Westinghouse not to manufacture in Japan.

---

**33.** See GX No. 3, at pp. W4746–48. Westinghouse was allowed to export to Japan in certain circumstances, primarily when the purchaser insisted that it wanted Westinghouse products. *Id.* at 4748.

**34.** See GX Nos. 8, at p. 10; 39, at p. 4631; 67, at p. Melco 03278; 95, at p. W4700. See also GX Nos. 1218, 1418.

**35.** See GX Nos. 8, at p. W25; 39, at pp. 4641–42; 67, at p. Melco 03289. The 1967 contract with MHI granted Westinghouse an unlimited license, even in Japan. GX No. 95, at pp. 4708–09; GX Nos. 1215–16.

The Government's claim must therefore rest on the contention that agreements among the defendants which licensed Westinghouse use and sale of products throughout the world, except in Japan, did in fact result in restrictions on Westinghouse exports to Japan of products not embodying the patent technology. However, the Government has failed to prove that it is more probable than not that these clauses constituted tacit promises by Westinghouse not to sell nonpatented products in Japan in contravention of Section 1 of the Sherman Act. The fact that Melco acted as a nonexclusive agent for Westinghouse in selling certain electrical equipment in Japan does not indicate that Westinghouse never seriously intended to compete with Melco or MHI in Japan. Westinghouse expressly retained the right to sell its products in Japan on its own, and only permitted Melco to act on written authorization pursuant to specific terms set forth by Westinghouse.[36]

The Government alleges that Westinghouse had a much smaller share of the Japanese import market than its share of the domestic United States market in gas turbines, steam turbines, power circuit breakers, waterwheel generators, and automatic merchandising equipment which are all covered by the Licensing Agreement.[37] The Government contends that this demonstrates a Westinghouse intention not to compete in Japan. The validity of equating share of market in Japan with that in the United States is highly dubious no matter what time frame is used. It fails to account for tariff considerations, variations in cost of sales, advertising, sales promotion, local consumer preferences and a host of other relevant factors. Even disregard-

ing the dubiousness of the Government's theory, its submissions on this point are highly misleading. They compare the Westinghouse share of the United States market in a product in one period with its share of the Japanese import market in a different period.[38] Moreover, the value of the evidence in showing the competitive relationship between Westinghouse and Melco and MHI is limited since the Government offers no evidence of sales by Melco and MHI in Japan, or of the relationship between such sales and those of Westinghouse. In any event, the volume of Westinghouse sales in Japan of the products adduced by the Government is sufficient to demonstrate beyond any doubt that Westinghouse was competing for Japanese business. Finally, the Government has deliberately ignored a vast assortment of products covered by the Licensing Agreements with respect to which Westinghouse had a large share of the United States export business in Japan.[39] In sum, the evidence shows that the contract provisions were intended only as lawful license restrictions. They leave Westinghouse free to sell products in Japan unless developed with Melco and MHI patent technology and therefore subject to all lawful restrictions based upon patent rights. No unlawful restrictions have been shown.

## IV

The Government also claims that Westinghouse forced Melco and MHI, against their wills, to include unwanted products within their Licensing Agreements of 1966 and 1967. Such a tying agreement

---

**36.** See GX No. 743, at p. W prior 708; GX Nos. 56–57.

**37.** See GX Nos. 1419, 1419B, 1531, 1526, 1552, 1785.

**38.** For example, the Government chooses to compare Westinghouse steam turbine sales in the United States from 1962–68 with its Japanese sales from 1964–1970, suggesting that these are "comparable" periods. The use of different periods is curious since in 1962, which is included in measuring American sales but not for Japanese sales, Westinghouse gross

billings of $5,582,000 for its steam turbine sales in Japan exceeded those of all other United States companies ($3,127,000). GX No. 1419B. On the other hand, 1970 was an unfavorable year for Westinghouse in the volatile Japanese steam turbine market, in which total American sales varied from $14,633,000 in 1966, to $55,-000 in 1968. The Government's use of statistics is therefore, to say the least, highly questionable.

**39.** See GX Nos. 1419B, 67, 95.

would violate the antitrust laws if it was obtained by coercion and substantially restrained the commerce of the United States. *Fortner Enterprises, Inc. v. United States Steel Corp.,* 394 U.S. 495, 89 S.Ct. 1252, 22 L.Ed.2d 495 (1969); *Northern Pacific Railway Co. v. United States,* 356 U.S. 1, 5–7, 78 S.Ct. 514, 2 L.Ed.2d 545 (1958). It would not, however, be unlawful if Westinghouse offered a package deal, and Melco or MHI accepted it voluntarily. *Unger v. Dunkin' Donuts, Inc.,* 531 F.2d 1211, 1218–25 (3d Cir.), *cert. denied,* 429 U.S. 823, 97 S.Ct. 74, 50 L.Ed.2d 84 (1976).

Westinghouse argues that even if the agreements contain tying arrangements, they do not restrain United States foreign commerce within the meaning of the Sherman Act because they only involve rights of non-American companies to sell goods employing Westinghouse patents and technology in foreign countries. This argument overlooks the fact that in selling technology and patent licenses to Melco and MHI, Westinghouse earned revenues which had at least some direct impact on the domestic economy of the United States. It was therefore engaged in a form of commerce which justifies the application of American antitrust law. *Cf. Timberlane Lumber Co. v. Bank of America, N.T. & S.A.,* 549 F.2d 597 (9th Cir. 1976); *Pacific Seafarers, Inc. v. Pacific Far East Line, Inc.,* 131 U.S.App.D.C. 226, 404 F.2d 804 (1968), *cert. denied,* 393 U.S. 1093, 89 S.Ct. 872, 21 L.Ed.2d 784 (1969).

So the question becomes one of the degree of impact. Even when a tying arrangement does restrain United States foreign commerce, the restraint is unlawful only when a "not insubstantial" amount of foreign commerce is affected. *Fortner Enterprises, Inc. v. United States Steel Corp., supra,* 394 U.S. at 501, 89 S.Ct. 1252. The Government's failure to present any evidence regarding the substantiality of defendants' restraint of commerce requires the Court to dismiss the claims based on the alleged tying arrangements.[40]

Yet another reason calling for dismissal of the tying complaint is the absence of any evidence that either Melco or MHI was coerced into including unwanted products in its agreement. There is no direct testimony to show that Melco and MHI acted involuntarily in any way in signing licensing agreements.[41] Instead, the Government's case stands solely on documents written by the defendants during their negotiations for the 1966 and 1967 licensing agreements—documents which do not show any coercion by Westinghouse. All the documents do show is that Westinghouse was determined to try to convince Melco and MHI that they would benefit from a broad agreement.[42] To be sure, certain documents indicate that Westinghouse informed Melco that if some of the product lines were deleted from the agreement, Westinghouse would seek an upward

---

**40.** Indeed, the Government has not shown any adverse impact upon competition in know-how (the "tied" product). It has not even established that there were any competing sources of know-how to be affected. Nor has it demonstrated that Melco or MHI felt precluded from purchasing the tied product from Westinghouse competitors. Finally, there is little support for the Government's contention that the royalties charged by Westinghouse were so high that Melco could not remain competitive if it paid additional royalties to other sources of know-how, assuming there were any. See, e. g., GX No. 513 (indicating that Melco purchased technological information from RCA concerning color television in addition to the information available from Westinghouse); GX No. 627 (showing that Melco needed a patent license from Texas Instruments for the manu-

facture of integrated circuits as well as technical support from Westinghouse).

**41.** This case is somewhat unique among tying actions because the plaintiff is not the person allegedly required to accept unwanted products or services (*cf. Fortner Enterprises, Inc. v. United States Steel Co.,* 394 U.S. 495, 89 S.Ct. 1252, 22 L.Ed.2d 495 (1969); *Ungar v. Dunkin' Donuts, Inc.,* 531 F.2d 1211 (3d Cir.) *cert. denied,* 429 U.S. 823, 97 S.Ct. 74, 50 L.Ed.2d 84 (1976)), and there is a serious dispute about whether coercion existed (*cf. Northern Pacific Railway v. United States,* 356 U.S. 1, 78 S.Ct. 514, 2 L.Ed.2d 545 (1958)).

**42.** See GX Nos. 1291; 1293; 1328, at p. W2685; 1332, at p. W3029.

revision of royalty rates for the remaining products.[43] But there is no evidence that Westinghouse insisted on receiving the identical total royalty regardless of how many products were included in the package.[44] Nor is there any indication that the Westinghouse "threat" had the slightest impact on Melco's ultimate decision to accept a broad package.[45] Long before negotiations as to royalties had been completed, Melco decided to seek a broad agreement in the belief that it would be beneficial to Melco, and not because of any fear that Westinghouse would otherwise impose a higher royalty.[46]

Furthermore, an antitrust violation would not necessarily be established by a showing, had there been any, that Melco or MHI agreed to a broad package of products because they feared an increased royalty rate on wanted products. *Ungar v. Dunkin' Donuts, Inc., supra,* at 1224. A tying arrangement is not illegal if the buyer is free to select wanted products and to reject the rest, even though the buyer has to pay a higher price for each product than if he had taken the entire package. *SmithKline Corp. v. Eli Lilly & Co.,* 427 F.Supp. 1089 (E.D.Pa.1976), *aff'd on other grounds,* 575 F.2d 1056 (3d Cir. 1978); *Northern Pacific Railway Co. v. United States,* 356 U.S. 1, 6 n. 4, 78 S.Ct. 514, 2 L.Ed.2d 545 (1958). The evidence demonstrates that defendants engaged in bona fide, arms-length negotiations in which Melco and MHI were free to take part of the package, albeit perhaps, at a higher royalty rate.[47]

## V

The Government further claims that Westinghouse violated Section 1 of the Sherman Act by forcing Melco and MHI to pay royalties on the sales of all products in the categories covered by their license agreements, whether or not Westinghouse technology was used. In this claim the Government relies entirely on *Zenith Radio Corp. v. Hazeltine Research, Inc.,* 395 U.S. 100, 89 S.Ct. 1562, 23 L.Ed.2d 129 (1969), where the Court found that it would constitute patent abuse for a holder of radio and television equipment patents to insist that its licensee pay royalties on sales of television and radio sets which did not embody the patented processes.

[19, 20] However, *Zenith* found an agreement to base royalties on the sale of nonpatented as well as patented products unlawful only where the arrangement was imposed by patentee's coercion on the licensee, and not where it was voluntarily adopted by the latter. *Id.* 395 U.S. at 155, 157, 89 S.Ct. 1562. *See also Automatic Radio Manufacturing Co. v. Hazeltine Research, Inc.,* 339 U.S. 827, 70 S.Ct. 894, 94 L.Ed. 1312 (1950). The sparse evidence introduced by the Government fails to show that either Melco or MHI was coerced into agreeing to base royalty payments on total sales, including products not embodying Westinghouse technology. Indeed, most of the evidence offered deals with the unsavory attempt by all of the defendants to skirt the Japanese Government's policy against this sort of royalty agreement,[48] and not with the desire of Melco or MHI to alter Westinghouse royalty requests.[49] Furthermore, *Zenith* es-

---

**43.** See GX Nos. 1317; 1294, at p. W4884; 1298, at p. W4965.

**44.** Such an insistence would have constituted a violation of the Sherman Act. See *American Securit Co. v. Shatterproof Glass Corp.,* 268 F.2d 769 (3d Cir.), *cert. denied,* 361 U.S. 902, 80 S.Ct. 210, 4 L.Ed.2d 157 (1959); *cf. Rocform Corp. v. Acitelli-Standard Concrete Wall, Inc.,* 367 F.2d 678 (6th Cir. 1966).

**45.** See GX No. 1294, at pp. 4878, 4884.

**46.** See GX Nos. 1300–02.

**47.** Indeed, Westinghouse accepted MHI's proposal to exclude some products from their

agreement. See GX No. 1329, at p. W prior 601.

**48.** See, e. g., GX Nos. 1271; 1279 at pp. W6349–50; 1298, at pp. 4964–65; 1216, at pp. W prior 559–60; 1335; 1310–½; 76; 78; 102; 103.

**49.** There are a few documents which show that Melco suggested that proposed new, contracts be altered to eliminate royalties on sales not directly utilizing Westinghouse technology. See, e. g., GX No. 639, at p. W4819; GX No. 644, at pp. 7–9. In response, Westinghouse expressed its willingness to negotiate the matter, and made no demands that royalties be

tablished that even where the existence of coercion by the patentee indicates that patent misuse has occurred, it does not necessarily follow that the patentee's activities constitute an antitrust violation. *Zenith Radio Corp. v. Hazeltine Research, Inc., supra*, 395 U.S. at 140, 89 S.Ct. 1562.[50] The Government can substantiate an antitrust violation only by establishing that the situation involves an illegal tying arrangement, which the Government has failed to do.

Other claims made by the Government are so obviously lacking in validity, that although considered, they merit neither delineation nor discussion. Over-all, the evidence is insufficient to justify denial of defendants' motion to dismiss.[51]

The foregoing constitute the Court's findings of fact and conclusions of law.

IT IS THEREFORE HEREBY ORDERED that all of the Government's claims are dismissed pursuant to Fed.R.Civ.P. 41(b). The Clerk is directed to enter judgment for the defendants.

---

paid on total sales. See GX No. 639, at p. W4819.

**50.** *Zenith* was returned to the court of appeal, but the antitrust issue was not raised. *See Zenith Radio Corp. v. Hazeltine Research, Inc.,* 401 U.S. 321, 91 S.Ct. 795, 28 L.Ed.2d 77 (1971).

**51.** The Court is indebted to Professor Jack H. Friedenthal of Stanford University for an analysis and evaluation of the evidence. It was provided based upon a stipulation of the parties authorizing the Court to draw upon Professor Friedenthal for "such assistance, consultation and services as the Court, in its discretion, may desire from time to time."