UNITED STATES of America, Plaintiff-Appellant,

v.

WESTINGHOUSE ELECTRIC CORPO-RATION, Mitsubishi Electric Corporation, and Mitsubishi Heavy Industries, Ltd., Defendants-Appellees.

MITSUBISHI ELECTRIC CORPORA-TION, and Mitsubishi Heavy Industries, Ltd., Defendants-Cross-Appellants,

v.

UNITED STATES of America, Plaintiff-Cross-Appellee.

Nos. 79–4109, 79–4332 and 79–4333.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted Dec. 8, 1980.

Decided June 18, 1981.

Moses Lasky, Lasky, Haas, Cohler & Munter, San Francisco, Cal., Marion Jetton,

Washington, D. C., argued; Barry Grossman, Washington, D. C., on brief for U. S. A.

James K. Haynes, Orrington, Herrington, Rowley & Sutcliffe, San Francisco, Cal., on brief, for MEC and MHI defendants-appellees.

Before DUNIWAY, GOLDBERG,* and CANBY, Circuit Judges.

DUNIWAY, Circuit Judge:

The United States appeals from the district court's dismissal of its civil action against Westinghouse Electric Corporation ("Westinghouse"), Mitsubishi Electric Corporation ("MELCO"), and Mitsubishi Heavy Industries, Ltd. ("MHI"), (together, "Mitsubishi") alleging violation of section 1 of the Sherman Act, 15 U.S.C. § 1. MELCO and MHI cross-appeal from the district court's imposition of monetary sanctions under F.R.Civ.P. 37 for delinquency in discovery.

### I. Background—No. 79-4109.

It is now well over ten years since the government filed this action on April 22, 1970, but it was not ready for trial until some six years later. Trial was to the court, and on June 16, 1976, at the conclusion of the government's case-in-chief, the defendants moved for dismissal under F.R. Civ.P. 41(b). The motion was granted and the suit dismissed on October 20, 1978. *United States v. Westinghouse Electric Corp.*, N.D.Cal., 1978, 471 F.Supp. 532.

As might be expected in an antitrust action of this scope, the record and the burdens placed on the parties and the court in this litigation have been formidable. More surprising has been the tergiversations in the government's presentation of its claim for relief. It is fair to say that the government alleged one theory of antitrust violation in its complaint, relied in major part upon another theory at trial, and now appeals on the basis of its original theory. The district judge expressed his distress at the "United States' frequent shifting of position," with the lack of "diligent, effective, workmanlike prosecution," and with the government's failure to determine "just what was its cause of action." R.T. 3040.

The complaint charges that certain Technical Assistance Agreements entered into by Westinghouse with MELCO and with MHI violated § 1 of the Sherman Act. The companies or their predecessors have had agreements to share technology since 1923. This longstanding relationship, briefly interrupted by World War II, was re-established in the post-War era by new agreements between Westinghouse and MELCO in 1951 and between Westinghouse and a predecessor of MHI in 1952. These agreements were renewed in essentially the same form in 1966 and 1967, respectively.

The 1966 and 1967 Technical Assistance Agreements grant to MELCO and MHI licenses to manufacture, use, and sell certain electrical products under Westinghouse's foreign patents, except Canadian. No license is granted under Westinghouse's United States or Canadian patents. But nothing in the agreements forbids Mitsubishi's manufacturing, using, or selling the enumerated products in the United States or Canada. In return for licensing its foreign patents, Westinghouse is granted a royalty and a reciprocal license to manufacture, use, and sell products incorporating MELCO or MHI patents or knowhow.

The government's first theory, urged below and now on appeal, as to why these Technical Assistance Agreements violate § 1 of the Sherman Act, may be stated as follows. The United States market for the electrical products covered by the agreements is heavily concentrated. Although they are two of the largest manufacturers of electrical products outside the United States, MHI and MELCO do not compete in this market. Their entrance into the Unit-

---

* The Honorable Irving L. Goldberg, Senior United States Circuit Judge for the Fifth Circuit, sitting by designation.

ed States market would substantially increase the amount of competition in that market. By 1965 MELCO and MHI wished to sell in the United States and had the technical ability to design around Westinghouse's many patents. Their failure to do so, the government contends, is a direct result of the Technical Assistance Agreements. Because MELCO and MHI are licensed by the Agreements under Westinghouse's foreign patents, and because they have had such licenses for a long period of time, they have become so committed to Westinghouse technology as to be economically incapable of developing new products that might compete in the United States without infringing upon Westinghouse's United States patents. Without licenses under Westinghouse's United States patents, MELCO and MHI are effectively barred from the United States market by dint of the patent laws and the heavy investment in Westinghouse technology that the Technical Assistance Agreements induced them to make.

The theory is novel and laced with paradox. By the act of helping MELCO and MHI to prosper and to grow into large corporations in its own image, Westinghouse is said to have insulated its home market from their competition in violation of the antitrust laws. The government urges that although the Agreements may not have resulted in an unreasonable restraint of trade when first signed in 1951 and 1952, at some point in 1965, when MELCO and MHI became capable of competing in the United States and capable of designing around Westinghouse's patents but for their investment in Westinghouse technology, the Agreements came to violate the antitrust laws. Accordingly, the government asked the district court to order an end to the Agreements and to require Westinghouse to license MELCO and MHI under its United States patents.

At trial the government put forward several other theories as to why the Agreements violated the antitrust laws. Chief among these theories, and the main theory on which the government went to trial, was the claim that MELCO and MHI had tacitly agreed with Westinghouse not to compete in the United States while Westinghouse had similarly agreed not to enter the Japanese market. In addition, the government charged that Westinghouse had been guilty of patent abuse and of imposing a tying arrangement by forcing MELCO and MHI to pay royalties on certain products not covered by Westinghouse patents, and by requiring MELCO and MHI to include products in the Agreements that they did not want.

## II. *The Merits.*

In a careful opinion, the district judge answered each of the government's theories. On this appeal the government does not challenge the bulk of the court's opinion. It does not challenge the district court's rejection of its claim of a territorial allocation conspiracy—a central contention at trial—or the rejection of its claims of an illegal tying agreement and of patent abuse.

The appeal is narrow and rests on two contentions. First, the government attacks the district court's rejection of its theory that Mitsubishi has become so wedded to Westinghouse technology, because of the Agreements, as to be unable to compete in the United States market, the theory upon which the case was instituted. Second, the government argues that the district court erred in its handling of evidence that MHI and MELCO would not sell products listed in the Technical Assistance Agreements without first receiving approval from Westinghouse. We reject both arguments; the first is wholly without support in law, the second is without support in fact.

There is an obvious tension between the patent laws and antitrust laws. One body of law creates and protects monopoly power while the other seeks to proscribe it. *Bement v. National Harrow Co.*, 1902, 186 U.S. 70, 91, 22 S.Ct. 747, 755, 46 L.Ed. 1058; *Handgards, Inc. v. Ethicon, Inc.*, 9 Cir., 1979, 601 F.2d 986, 992. "The patent laws which give a 17-year monopoly on 'making, using or selling the invention' are in *pari materia* with the antitrust laws and modify

them *pro tanto.*" *Simpson v. Union Oil Co.,* 1964, 377 U.S. 13, 24, 84 S.Ct. 1051, 1058, 12 L.Ed.2d 98.

Of course, a patent holder may run afoul of the antitrust laws. "[M]onopolization knowingly practiced under the guise of a patent procured by deliberate fraud" may violate the antitrust laws. *Walker, Inc. v. Food Machinery,* 1965, 382 U.S. 172, 179–80, 86 S.Ct. 347, 351–352, 15 L.Ed.2d 247 (Harlan, J., concurring). So, too the use of a patent "to acquire a monopoly which is not plainly within the terms of the grant," *Mercoid Corporation v. Mid Continent Investment Co.,* 1944, 320 U.S. 661, 665–66, 64 S.Ct. 268, 271, 88 L.Ed. 376, as by a tying agreement, may violate the antitrust laws as may an agreement among patent holders or licensees to set prices, *see, e. g., United States v. Line Material Co.,* 1948, 333 U.S. 287, 68 S.Ct. 550, 92 L.Ed. 701, or to refuse to grant licenses except upon condition that royalties be paid on unpatented products. *Zenith Radio Corp. v. Hazeltine Research, Inc.,* 1969, 395 U.S. 100, 135, 89 S.Ct. 1562, 1583, 23 L.Ed.2d 129. Nor may a patentee attempt to monopolize an industry by acquiring all present and future patents relevant to that industry. *Kobe, Inc. v. Dempsey Pump Co.,* 10 Cir., 1952, 198 F.2d 416, 422–24.

In all of the above cases, and in all of the cases cited by the government, the offending patentee seeks to do more than enjoy the limited monopoly granted by the patent laws. He seeks to expand that monopoly by misuse, agreement, or accumulation. In advancing its theory, however, the government argues that an antitrust violation may be found where a patent holder does precisely that which the patent laws authorize. Westinghouse has done no more than to license some of its patents and refuse to license others. "[T]he right to invoke the State's power to prevent others from utilizing his discovery without his consent" is the essence of the patentee's statutory monopo-

ly. *Zenith Radio Corp., supra,* 395 U.S. at 135, 89 S.Ct. at 1583, citing *Continental Paper Bag Co. v. Eastern Paper Bag Co.,* 1908, 210 U.S. 405, 28 S.Ct. 748, 52 L.Ed. 1122; *Crown Die & Tool Co. v. Nye Tool & Machine Works,* 1923, 261 U.S. 24, 43 S.Ct. 254, 67 L.Ed. 516. The right to license that patent, exclusively or otherwise, or to refuse to license at all, is "the untrammeled right" of the patentee. *Cataphote Corporation v. DeSoto Chemical Coatings, Inc.,* 9 Cir., 1971, 450 F.2d 769, 774. In short, in granting MELCO and MHI some licenses but not others, Westinghouse did no more than employ means "normally and reasonably adapted to secure pecuniary reward for the [patent] monopoly." *United States v. General Electric Co.,* 1926, 272 U.S. 476, 490, 47 S.Ct. 192, 197, 71 L.Ed. 362; *Hensley Equipment Co. v. ESCO Corp.,* 5 Cir., 1967, 383 F.2d 252, 260.

We are aware that the patents that Westinghouse has licensed to Mitsubishi are not United States patents, but are foreign patents. But the government does not argue that the right to license or not to license them is different from the right of the holder of United States patents to license or not to license those patents.[1] In *Dunlop Co., Ltd. v. Kelsey-Hayes Co.,* 6 Cir., 1973, 484 F.2d 407, Dunlop owned certain foreign patents related to automobile disc brakes. It was argued that certain of its foreign licenses, which forbade exportation of its brakes from foreign countries to the United States, violated our antitrust laws. The court did not agree:

> Dunlop's agreements with its licensees in Japan, Italy, Germany and Australia cannot be characterized as true horizontal agreements dividing markets. They are merely territorial licenses granted by a patentee such as are permitted by 35 U.S.C. § 261. If one who received a patent from the United States may so restrict his licenses without violating the domestic antitrust laws, it would seem

---

1. Absent a showing to the contrary, it is presumed that foreign law is the same as the law of the forum. *San Rafael Compania Naviera, S. A. v. American Smelting & Refining Co.,* 9 Cir., 1964, 327 F.2d 581, 587. *See also 1700 Ocean Avenue Corp. v. GBR Associates,* 9 Cir., 1966, 354 F.2d 993, 994.

clear that a patentee could do the same thing with foreign licenses without violating the antitrust laws of this country. (p. 417)

Moreover, the other half of the government's theory is that, because Westinghouse has, in effect, burdened Mitsubishi with its foreign patent licenses, thus tying it to Westinghouse technology, Westinghouse should now be required to license its United States patents to Mitsubishi, so that Mitsubishi can compete in the United States. Yet this part of the theory flies in the face of the rule that a holder of United States patents has a right to refuse to license them.

▮▮▮▮ To find an antitrust violation because Westinghouse, having licensed its foreign patents to Mitsubishi, has thereby helped them to become potential competitors in the United States, but has not granted them licenses of its United States patents, which they need in order to compete here, would severely limit the protection extended by Congress in the laws under which Westinghouse's United States patents were granted. The antitrust laws do not grant the government a roving commission to reform the economy at will. Just as "[n]o court has ever held that the antitrust laws require a patent holder to forfeit the exclusionary power inherent in his patent the instant his patent monopoly affords him monopoly power . . . ," *SCM Corporation v. Xerox Corporation,* 2 Cir., 1981, 645 F.2d 1195, 1204, so, too, no court has held that a patentee must grant further licenses to potential competitors merely because he has granted them some licenses. Just as "[t]he patent system would be seriously undermined . . . were the threat of potential antitrust liability to attach upon the acquisition of a patent at a time prior to the existence of the relevant market and, even more disconcerting, at a time prior to the commercialization of the patented art," *Id.* at 1206, so too would the patent system be undermined if a licensing agreement, per-

fectly legal when signed, might later form the basis of an antitrust violation because the licensee had flourished under the agreement.

We agree with the district court that the government's theory "[t]aken to its logical limits . . . would find almost every patent licensing agreement to be illegal." *United States v. Westinghouse, supra,* 471 F.Supp. at 542. The theory is "calculated to alter and substantially reduce the established scope of the patent monopoly. It should properly be addressed to Congress, not to the courts." *Id.* Thus, even if, as seems unlikely, there is any economic basis for the theory, that is, even if it is true that MHI and MELCO would have entered the United States electrical equipment market by designing new products but for their existing success with Westinghouse technology, there is no basis for the theory in law.

The government's second argument on appeal is that the district court erred in its handling of evidence that Mitsubishi would not sell products listed in the Technical Assistance Agreement in the United States without first receiving approval from Westinghouse. The court refused to draw the conclusion that requests for approval indicated a conspiracy not to compete: "[T]he significance of the requests for approval on the question of the existence of an illegal agreement not to compete in the United States depends on the state of mind of MELCO and MHI in seeking Westinghouse approval. MELCO and MHI argue that they did not act on the basis of an illegal agreement with Westinghouse but rather out of fear of infringing Westinghouse patents." *United States v. Westinghouse Electric Corp., supra,* 471 F.Supp. at 538. The court concluded that the government had failed to meet its burden of proof.[2]

The government now argues that the court erred in focusing on motivation: If the *effect* of the Agreements and of the requests for and denials or grants of approval was to unreasonably limit competition in the United States, then the Agree-

---

2. This is a finding of fact, made pursuant to F.R.Civ.P. 41(b) and 52(a), to which the "clear-

ly erroneous" rule of 52(a) applies. The finding is not clearly erroneous.

ments violate the antitrust laws regardless of whether the motivation of the parties is to divide the market or to avoid patent infringement.

The government's reasoning is seriously flawed. If fear of patent infringement was the reason Mitsubishi sought Westinghouse approval before selling products covered by the Agreements in the United States, then it cannot be said that the resulting lack of competition was the "effect" of the Agreements rather than the effect of Westinghouse's patents. The government bears the burden of showing causation. *See United States v. Arnold, Schwinn & Co.*, 1967, 388 U.S. 365, 374 n.5, 87 S.Ct. 1856, 1863 n.5, 18 L.Ed.2d 1249. It must show that some combination or conspiracy between the parties "actually causes injury to competition," *Kaplan v. Burroughs Corp.*, 9 Cir., 1979, 611 F.2d 286, 290, in violation of the antitrust laws. The district court's conclusion that the government failed to show this causal link is amply supported by the record as the district court's own discussion makes plain. *United States v. Westinghouse, supra*, 471 F.Supp. at 539–41. The desire of Mitsubishi to avoid infringing upon Westinghouse's many patents—perhaps even as to products only arguably covered by Westinghouse's patents—undoubtedly has an effect on competition, but this is an effect which results from the monopoly granted by the patent laws and does not establish an antitrust violation by the companies in this case.

### III. *Discovery Sanctions—Nos. 79–4332 and 79–4333.*

MELCO and MHI cross-appeal from the district court's imposition of monetary sanctions under F.R.Civ.P. 37(b)(2)(D) for their failure to comply with two orders compelling discovery.

#### A. *Background.*

The chain of events culminating in the discovery sanctions is intricate. In August, 1972, without objection from the parties, and under authority of 28 U.S.C. § 636(b) and former Local Rule 502(3), the district judge referred all discovery matters for hearing by a magistrate. In January, 1973, the government served a set of interrogatories on MHI and MELCO. These form the basis of what may be called the first discovery order. Some nine months later Mitsubishi had failed to answer these interrogatories, and the magistrate proposed an order that answers be filed within thirty days. The district court adopted the order on October 23, 1973, and the answers were therefore due by November 22, 1973.

On November 19, 1973, at a hearing on another matter, Mitsubishi asked for an extension of time until January 15, 1974. Counsel described the expense and difficulty of international communication and argued that an extension would allow the companies to formulate an overall response to these interrogatories as well as to a later set of interrogatories. The magistrate expressed sympathy with the motion but told counsel to put the motion in writing.

Counsel did not file a written motion for extension of time until November 26, 1973, four days after the interrogatories were to have been answered under the court's order. The motion repeated the arguments for extension advanced earlier. The government opposed the motion and requested sanctions, and the magistrate scheduled a hearing on the matter.

On December 19, 1973, after the hearing was cancelled at the request of counsel for Mitsubishi, the magistrate issued his findings and proposed orders. Finding that "there has been an insufficient showing that an unreasonable burden has been placed upon the Mitsubishi defendants by the plaintiff's discovery," the magistrate recommended denial of the extension request. Finding that "despite repeated admonitions from the Magistrate and the Court," the companies failed to comply with the court's order of October 23, 1973, the magistrate proposed that a fine of $500.00 a day be assessed against each company for each day after November 22, 1973 that the company remained in non-compliance with the court's order.

The magistrate expressed the hope that these sanctions "together with cautionary language in the court's order may serve to bring to the attention of MEC and MHI the deficiencies that the court sees in the present posture of discovery. Hopefully (sic) it will bring about such changes as are necessary to move this case along to a trial date in the *foreseeable* future." He warned of further more drastic sanctions under Rule 37 in the event the companies continued to obstruct discovery. The companies finally complied with the court's order on January 15, 1974.

Following a hearing, the district judge adopted the magistrate's findings and proposed orders on February 15, 1974. After another hearing on May 9, 1974, the district judge adopted the magistrate's further order that the companies each pay $27,000 for their non-compliance.

A second set of interrogatories, leading to a second set of sanctions, was served on Mitsubishi in August, 1973. The companies did provide some answers. These were deemed inadequate, however, and in his December 19, 1973 findings and orders the magistrate included orders requiring the companies to provide complete answers by January 15, 1974, or face $500.00 per day sanctions. The companies eventually provided the answers approximately one month late—MELCO on February 12 and MHI on February 15. The magistrate's orders were signed by the district court with the other discovery orders following a hearing on February 15, 1974. After a hearing before the magistrate and then a further hearing before the court, the companies were ordered on May 9, 1974, to pay fines of $500.00 a day for their late compliance amounting to $14,000 and $15,000 against MELCO and MHI, respectively.

### B. *The Merits.*

The companies argue that the fines levied for their failure to abide by the first and second discovery orders were excessive and were levied without proper procedures. In addition, with respect to the second discovery order, they argue that because they

had complied with the substance of the magistrate's proposed order before the order was adopted by the district court, they were never in violation of a court order—as opposed to a proposed order—and thus Rule 37(b)(2) was not properly applied.

Rule 37(b)(2) provides in relevant part that where "a party fails to obey an order to provide or permit discovery . . . the court in which the action is pending may make such orders in regard to the failure as are just, and among others the following: . . . (D) In lieu of any of the foregoing orders or in addition thereto, an order treating as a contempt of court the failure to obey any orders except an order to submit to a physical or mental examination."

Contrary to what both Mitsubishi and the government contend, the record reveals that the magistrate and court held the companies in civil contempt under Rule 37(b)(2)(D) for their failure to comply with the two discovery orders. The May 9, 1974 order levying sanctions with respect to the first discovery order explicitly states that the "sanction to be paid . . . pursuant to the prior orders and *Rule 37(b)(2)(D),* is $500.00 per day for 54 days . . ." E.R. at 70–71 (emphasis added). The magistrate's findings and proposed order levying sanctions as to the second discovery order, adopted by the district court on May 9, 1974, states in the introduction that "If there is to be any modification of dollar amounts as an exercise in judicial discretion or a finding that *civil contempt has been purged* this must be urged before the District Court." E.R. at 62 (emphasis added).

The confusion in this case as to the precise legal basis for the court's and magistrate's imposition of sanctions resulted in large part from the failure of the court or magistrate to make it clear. Indeed, at the February 15, 1974 hearing on the magistrate's proposed orders the court stated to Mitsubishi's counsel that "no one has claimed that you or any other defendant is in contempt." R.T. at 457. The court then shortly retracted this statement: "I am a little concerned that you may have thought that the remark I made . . . might have

been a representation to you or your client that this Court felt that there was some defect or improvidence in the Magistrate's order. The Court considers no such thing. I think the Magistrate's order was totally and fully proper, under the circumstances, and I approve it as made, without qualification or explanation or condition." R.T. at 459.

We think that it would have been far better and would have made these two appeals unnecessary had the magistrate and court taken the steps leading to the imposition of discovery fines with greater care to assure that the parties understood the legal basis for their action. Such is the particular responsibility of the magistrate and district court when exercising the contempt power and the powers granted by Rule 37. However, we believe that the companies were not prejudiced in this case, and fully understood what was expected of them and the risks of disobedience.

The government agrees that the companies were held in contempt but argues that this contempt was criminal and thus that the companies' cross-appeal is out of time under Fed.R.App.P. 4(b). We disagree. The magistrate explicitly characterized the companies' defiance of the second discovery order as civil contempt. Moreover, at no time did the magistrate or court inform the companies that they were in criminal contempt. Rule 42(b), Fed.R.Cr.P., requires that "A criminal contempt ... shall be prosecuted on notice. The notice shall state the time and place of hearing ... and shall state the essential facts constituting the criminal contempt charged *and describe it as such.*" (emphasis added). "This absence of compliance with 42(b) supports an inference that the contempt order was intended to be civil." *Brown v. Braddick,* 5 Cir., 1979, 595 F.2d 961, 965 n.6.

Looking beyond the intent of the magistrate and the court to the purpose of the fines, it is clear that the purpose was to compel the companies to comply with the court's schedule for discovery. With the exception of the fines levied in the first order for the period before the order—November 22, 1973 to December 19, 1974—and we deal further with this exception below, the companies could have purged themselves of contempt and of any fine through timely compliance. The sanctions were therefore remedial rather than punitive, prospective and for the benefit of the other party to the litigation rather than unconditional, retrospective, or in vindication of the state's authority. *Scott & Fetzer Co. v. Dile,* 9 Cir., 1981, 643 F.2d 670, 675. *See United States v. Powers,* 9 Cir., 1980, 629 F.2d 619, 626–27; *United States v. Wendy,* 2 Cir., 1978, 575 F.2d 1025, 1029 n.13. In short, the fines were compulsory in nature, *United States v. Asay,* 9 Cir., 1980, 614 F.2d 655, 659, and as such the contempt was civil. That the companies were forced to pay the piper even though they belatedly complied with the orders does not alter the civil nature of the contempt. *See Hoffman v. Beer Drivers & Salesmen's Local Union No. 888,* 9 Cir., 1976, 536 F.2d 1268, 1273.

With the understanding that the discovery sanctions were levied for civil contempt under Rule 37(b)(2)(D), it becomes clear that Mitsubishi's cross-appeal is timely. Civil contempt orders and orders imposing sanctions under Rule 37 are interlocutory and may not be appealed until entry of final judgment. *See Johnny Pflocks, Inc. v. Firestone Tire & Rubber Co.,* 9 Cir., 1980, 634 F.2d 1215; *Goldblum v. National Broadcasting Corp.,* 9 Cir., 1979, 584 F.2d 904, 906 n.2. The limited exceptions to this rule are not applicable to this case. *See David v. Hooker Ltd.,* 9 Cir., 1977, 560 F.2d 412, 415; *International Business Machines Corp. v. United States,* 2 Cir., 1973, 493 F.2d 112, 115 n.1; *Cf., Hoffman v. Beer Drivers & Salesmen's Local Union No. 888, supra,* 536 F.2d at 1273 (contempt proceeding the sole proceeding).

When the sanctions levied are viewed as for civil contempt, it is clear that, with one exception, they were not excessive. The choice of discovery sanctions is left to the discretion of the district court. *Sigliano v. Mendoza,* 9 Cir., 1981, 642 F.2d 309, 310; *Liew v. Breen,* 9 Cir., 1981, 640

F.2d 1046, 1050. The court's decision to impose sanctions through a finding of civil contempt and a fine of $500.00 a day was not an abuse of discretion. In light of the size of the Mitsubishi companies, this fine was by no means excessive. *Cf. International Business Machines Corp. v. United States, supra,* 493 F.2d at 115–16 (coercive fine of $150,000 per day until company complies with discovery order). Because the fine was designed to compel rather than to compensate, Mitsubishi's argument that the fine was excessive because greater than the government's expense is without merit.

■ On the other hand, we do consider that one portion of the fine levied for violation of the first discovery order was excessive. The magistrate issued his proposed findings and orders on December 19, 1973. He found that the companies had failed to comply with the court's October 23, 1973 order that discovery as to the first set of interrogatories be made by November 22, 1973, and he suggested that a fine be set of $500.00 per day until the companies complied. However, the starting date for the fine was not set at December 19, but at November 22. Thus the companies were fined for a period prior to the proposed finding of civil contempt and the setting of sanctions. They were fined for this period despite their pending request for an extension of time and despite the magistrate's initial indication that he would look favorably upon the request. This portion of the fine is not in keeping with the prospective nature of civil contempt sanctions or with "the doctrine that a court must exercise '[t]he least possible power adequate to the end proposed.'" *Shillitani v. United States,* 1966, 384 U.S. 364, 371, 86 S.Ct. 1531, 1536, 16 L.Ed.2d 622 (citation omitted). On remand, the fine must be recalculated so as to exclude the period from November 22, 1973 to December 19, 1973.

■ The companies also argue that the sanctions were levied without the requisite procedural safeguards. However, we find that the procedures used were adequate in the context of civil contempt. The district court need not follow the procedures set out in Fed.R.Cr.P. 42(b) before levying a civil contempt fine. *United States v. Asay,* 9 Cir., 1980, 614 F.2d 655, 659. Nor can it be said that the companies were denied a hearing on the question of contempt. They were provided hearings or an opportunity to be heard at every step of the way. At no time did they seek to show that it was impossible for them to comply with the discovery orders or that any material fact pertaining to the question of contempt was in dispute so as to require an evidentiary hearing. *Hoffman v. Beer Drivers & Salesmen's Local Union No. 888, supra,* 536 F.2d at 1277. Although we are disturbed by the lack of clarity in the orders of the magistrate and district court—particularly the December 19, 1973 "proposed" orders—the orders signed by the court May 9, 1974, following a hearing, explicitly informed the companies that they were in civil contempt while the companies were fully aware that the magistrate's earlier orders amounted to a finding of contempt, indeed protested below that the contempt was in the nature of criminal contempt. Thus, we detect no procedural shortcomings in the court's rulings that prejudiced the rights of the companies.

■ Finally, the companies argue that the sanctions imposed for violation of the magistrate's second discovery order exceeded the court's authority under Fed.R.Civ.P. 37(b). The companies argue that because "refusal to comply with a *court order* for discovery," *Henry v. Sneiders,* 9 Cir., 1974, 490 F.2d 315, 318 (emphasis in original), is a prerequisite to the application of Rule 37(b), and because they complied with the magistrate's "proposed" order of December 19, 1973, before that order was adopted by the district court on February 15, 1974, they were never technically in defiance of a "court order."

The magistrate's "proposed" order instructed the companies to supplement their interrogatories by January 15, 1974, or face a fine of $500.00 per day until compliance. Counsel for the companies had suggested this date to the magistrate and had assured him that answers could and would be made

by January 15. Yet even though the proposed order was tailored to their schedule, the companies defied the order for approximately one month. They would now have us absolve them of their disobedience. This we refuse to do.

To begin with, there is considerable support for the government's position that although called a "proposed" order, the magistrate's ruling was in fact, under the terms of the reference of the matter to the magistrate, a valid, operative order when signed by the magistrate and was so understood. If such were the case, Rule 37(b)(2) was properly applied for failure "to obey an order to provide or permit discovery." But even if the order was only a "proposed" order, the companies fully understood what was expected of them. They knew that the district court would in all likelihood sign the order. They were not unfairly surprised or prejudiced when he did so. They had notice, they gambled, and they lost. We believe that in these circumstances the magistrate's "proposed" order, once signed, satisfied the "order" prerequisite to application of Rule 37(b)(2). *Cf. Henry v. Sneiders, supra,* 490 F.2d at 318 ("absence of a written order does not preclude the entry" of sanctions where oral order was made and gave litigant notice). To accept the companies' argument would be to defeat both the purposes of Rule 37(b), *see State of Ohio v. Arthur Andersen & Co.,* 10 Cir., 1978, 570 F.2d 1370, 1375–76, and the purpose of the reference under the Magistrate's Act, 28 U.S.C. § 636, and former Local Rule 502(3).

It would have been better, and would have avoided this appeal, had it either been made clear that the "proposed" order was in fact an effective order appealable to the district court or had the proposed order promptly been signed by the court and the companies called to task as soon as the January 15 deadline passed without compliance. But on the facts here we do not find that the companies were prejudiced by this confusion and imprecision.

Affirmed in No. 79–4109. Affirmed in part and reversed and remanded in part for further proceedings consistent with this opinion in Nos. 79–4332 and 79–4333.