**AXIS, S.p.A., Plaintiff–Appellant,**

v.

**MICAFIL, INC., Defendant–Appellee.**

**Nos. 88–3113, 88–3245.**

United States Court of Appeals,
Sixth Circuit.

Argued Nov. 17, 1988.

Decided March 24, 1989.

Stanley M. Fisher, Walter M. Bates, Arter & Hadden, Cleveland, Ohio, William Rand, David H. Marks (argued), Robert E. Williams, New York City, for plaintiff-appellant.

Richard E. Guster, Roetzel & Andress, Akron, Ohio, Michael J. Levin (argued), Boyle, Vogeler & Haimes, New York City, for defendant-appellee.

Before WELLFORD, Circuit Judge, and PECK and LIVELY,* Senior Circuit Judges.

LIVELY, Senior Circuit Judge.

This is an appeal from dismissal of an antitrust action pursuant to Fed.R.Civ.P. 12(b)(6), for failure to state a claim upon which relief can be granted, 681 F.Supp. 1271. The question for decision is whether the injury claimed by the plaintiff in its complaint constitutes an "antitrust injury," a requirement for recovery of treble damages under § 4 of the Clayton Act, 15 U.S.C. § 15, and for injunctive relief under § 16 of the Clayton Act, 15 U.S.C. § 26. We conclude that the district court properly determined that the complaint failed to

---

\* The Honorable Pierce Lively became a senior judge on January 1, 1989.

## I.

### A.

Since the district court rendered judgment at the pleading stage, we must accept as true the facts alleged in the complaint. *Hishon v. King & Spalding*, 467 U.S. 69, 73, 104 S.Ct. 2229, 2232, 81 L.Ed.2d 59 (1984). Applying this standard, we treat the following facts as true.

Armatures are necessary components of fractional power commutator motors used in most small household appliances. To manufacture armatures efficiently the manufacturer must use an armature winding machine. The plaintiff, Axis, is an Italian corporation that manufactures armature winding machines and sells them to electrical appliance manufacturers throughout Europe. The defendant, Micafil, is a United States corporation that has manufactured and sold armature winding machines in the United States since 1985. Micafil is a wholly-owned subsidiary of Micafil, A.G., a Swiss corporation that manufactures and sells armature winding machines throughout Europe.

An armature winding machine winds copper wire around an armature arm to form a coil. The machine attaches the wire to a commutator and then cuts the wire. In the 1970s Globe Tool & Engineering Co. (Globe) and Possis Corporation (Possis) obtained United States patents on the only two wire cutting methods used in armature winding machines. In 1975 Globe and Possis granted each other a non-exclusive license "to make, have made, use, lease and sell" devices and methods falling within the scope of their patents. Sometime later Possis granted similar licenses to Ott–A–Matic, Inc. (Ott) and Mechaneer, Inc. (Mechaneer). In 1985, prior to Micafil's entry into the market, four companies manufactured and sold armature winding machines in the United States: Possis, Globe, Ott and Mechaneer. Three companies engaged in the same activities outside the United States: Axis, Micafil and Odawara, a Japanese corporation.

Prior to 1985 Possis refused to grant a license to any of the foreign armature winding machine manufacturers though all three sought such licenses. In July 1985, however, Possis sold its assets, including the patents and licenses covering armature winding machines, to Micafil. Micafil then entered the U.S. market. Shortly thereafter Axis learned that Micafil was attempting to purchase Mechaneer. When the president of Axis approached Mechaneer to determine whether Mechaneer was for sale, that company's principals refused to discuss the possibility of selling to Axis because Mechaneer's negotiations with Micafil were almost complete. Micafil bought Mechaneer in September 1985. Axis was ready, willing and able to purchase Mechaneer for the same price that Micafil paid. The two purchases enabled Micafil to control approximately 50% of the U.S. armature winding machine market (Possis had about 40% and Mechaneer about 10%).

At some unspecified time Odawara purchased Ott. As a result of the various acquisitions, the number of armature winding machine manufacturers in the United States shrunk from four to three. These three competitors, Globe, Micafil and Odawara, now own all the patents and licenses governing the manufacture of armature winding machines in the United States.

### B.

While alleging in its complaint that "the acquisition of Mechaneer by Micafil raised substantially the barriers to entry into the U.S. market for manufacture and sale of armature winding machines for all potential manufacturers, particularly Axis, and indeed, has prevented Axis' entry into the market," Axis also stated that "the Possis patents now owned by Micafil" are "[t]he only thing[s] preventing" Axis' entry into the market. The complaint charged Micafil with violating the antitrust laws by acquiring Mechaneer because the acquisition brought about a substantial reduction of competition in the market. Axis also alleged that by reason of the acquisitions it

had suffered lost sales and lost profits from winding machines that it would have sold in the United States had Micafil not purchased Mechaneer. In addition to treble damages under § 4, Axis sought an injunction under § 16 of the Clayton Act requiring Micafil either to divest itself of Mechaneer or to grant Axis express licenses to the Possis patents.

In granting Micafil's motion to dismiss, the district court assumed that the Mechaneer acquisition violated both § 1 of the Sherman Act and § 7 of the Clayton Act, as Axis claimed. Nevertheless, the court found that the complaint failed to state a claim because it did not allege an "antitrust injury." The court concluded that Axis would have suffered the same injury—exclusion from the U.S. market—if Micafil had not purchased Mechaneer. The Possis and Globe patents, not the purchase of Mechaneer, foreclosed Axis' entry into the market. Thus, the anticompetitive act of purchasing Mechaneer did not cause the plaintiff's alleged injury. The patents were an impenetrable barrier to the plaintiff's entry before Micafil purchased Mechaneer, and they remained as great a barrier afterwards. The district court also recognized that Odawara had been able to enter the U.S. market by purchasing Ott, an effort Axis apparently never made. This acquisition could have caused Axis' alleged injury. Thus, the court concluded, any injury that Axis may have suffered did not flow directly from Micafil's presumably unlawful act.

## II.

The Clayton Act uses very broad language to describe who may bring private actions for antitrust violations. Section 4 states that "any person who shall be injured in his business or property by reason of anything forbidden in the antitrust laws may sue ... and shall recover threefold the damages by him sustained." Section 16 provides that "[a]ny person, firm, corporation, or association shall be entitled to sue for and have injunctive relief ... against threatened loss or damage by a violation of the antitrust laws."

Despite the statute's all-encompassing language, the Supreme Court has determined that claims of injury by reason of antitrust violations are compensable only when the injury flows directly from the unlawful act. The Court noted in *Hawaii v. Standard Oil Co.*, 405 U.S. 251, 92 S.Ct. 885, 31 L.Ed.2d 184 (1972), that "[t]he lower [federal] courts have been virtually unanimous in concluding that Congress did not intend the antitrust laws to provide a remedy in damages for all injuries that might conceivably be traced to an antitrust violation." *Id.* at 263, n. 14, 92 S.Ct. at 891–92 n. 14. In *Associated General Contractors, Inc. v. California State Council of Carpenters*, 459 U.S. 519, 103 S.Ct. 897, 74 L.Ed.2d 723 (1983), after quoting *Hawaii v. Standard Oil Co.*, the Court stated that the question of whether a given plaintiff may recover for injury claimed to have been caused by an antitrust violation requires consideration of common law requirements for recovery of damages, such as causation, as well as the specific language of the antitrust laws. 459 U.S. at 535, 103 S.Ct. at 907.

The Supreme Court subjected a § 4 claim for treble damages to this analysis in *Brunswick Corp. v. Pueblo Bowl–O–Mat, Inc.*, 429 U.S. 477, 97 S.Ct. 690, 50 L.Ed.2d 701 (1977). That case involved the acquisition of failing bowling alleys by Brunswick, the giant in the bowling industry. Competitors of the acquired operations sued for treble damages, claiming that if Brunswick had not purchased the failing bowling alleys the alleys would have gone bankrupt. The plaintiffs claimed that as a result their business and profits would have increased. The Court assumed that acquisition of the alleys by the dominant actor in the industry violated § 7 of the Clayton Act by reducing competition, but determined that the acquisitions did not cause the plaintiffs' alleged losses. If any other solvent purchaser had acquired the alleys, or if the alleys had been able to obtain financing sufficient to stay in business, the result would have been the same—the plaintiffs would have been denied the profits they anticipated from the alleys' failure. As the Court stated: "while respondents' loss occurred 'by

reason of' the unlawful acquisitions, it did not occur 'by reason of' that which made the acquisitions unlawful." *Id.* at 488, 97 S.Ct. at 697.

The Court defined this limitation on the right to recover treble damages for § 7 violations [acquisitions whose effect "may be substantially to lessen competition, or to tend to create a monopoly"] as follows:

> We therefore hold that for plaintiffs to recover treble damages on account of § 7 violations, they must prove more than injury causally linked to an illegal presence in the market. Plaintiffs must prove *antitrust* injury, which is to say injury of the type the antitrust laws were intended to prevent and that flows from that which makes defendants' acts unlawful. The injury should reflect the anticompetitive effect either of the violation or of anticompetitive acts made possible by the violation. It should, in short, be "the type of loss that the claimed violations ... would be likely to cause." *Zenith Radio Corp. v. Hazeltine Research,* 395 U.S. [100] at 125 [89 S.Ct. 1562 at 1577, 23 L.Ed.2d 129].

*Id.* at 489, 97 S.Ct. at 697–98 (emphasis in original) (footnote omitted).

In *Cargill, Inc. v. Monfort of Colorado, Inc.,* 479 U.S. 104, 107 S.Ct. 484, 93 L.Ed.2d 427 (1986), the Supreme Court held that a plaintiff seeking injunctive relief under § 16 of the Clayton Act also must allege a threat of antitrust injury, that is, an injury "of the type the antitrust laws were designed to prevent and that flows from that which makes defendants' acts unlawful." *Id.* at 113, 107 S.Ct. at 491, quoting *Brunswick,* 429 U.S. at 489, 97 S.Ct. at 697. Thus, to survive a motion to dismiss, it was necessary that Axis' claims for damages and for injunctive relief both allege antitrust injury.

### III.

The parties repeat in this court the arguments they made in the district court. We will discuss the plaintiff-appellant's position in detail.

Axis insists that the district court misconstrued its complaint and misread decisions of the Supreme Court, this court, and other federal courts. Axis contends that the standard applied by the district court in this case would preclude almost all private antitrust actions. It interprets the district court opinion to hold that an antitrust plaintiff must show "not only that its injury flowed from the violation, but also that its injury could not have occurred under any alternative set of facts that did not include an antitrust violation."

### A.

Axis argues for a very narrow application of *Brunswick.* The acquisitions of the failing bowling alleys by Brunswick increased or at least maintained the level of competition in the relevant market. From this fact, Axis argues that *Brunswick* never precludes recovery for failure to allege antitrust injury when the plaintiff claims that the challenged acquisition reduces competition. While the fact that Brunswick's acquisitions would not reduce competition was certainly an important element of the *Brunswick* decision, that was not the only decisive factor. For purposes of the present case, another element of the decision is equally important. Aside from the acquisitions' effect on competition, the Court found no antitrust injury because the plaintiffs' injury, while causally connected to the acquisitions, was not caused by "that which made the acquisitions unlawful." 429 U.S. at 488, 97 S.Ct. at 697. The acquisitions were unlawful because Brunswick was the giant of the industry, and any acquisitions by it presumably would tend to reduce competition. However, it was not this potential reduction of competition that caused the plaintiffs' loss of anticipated profits. They would have suffered the same injury if the failing alleys had been kept in operation by other means. *Brunswick* stands for a much broader principle than that to which Axis would restrict it.

Axis seeks to support its position by citing two of the Supreme Court's post-*Brunswick* decisions, one of which dealt with § 4 antitrust standing and the other with § 16 antitrust injury. Antitrust injury is a concept distinct from antitrust

standing, but is an element in the determination of standing. Thus, even where there is antitrust injury, a plaintiff may be found to lack standing because other elements of the standing equation are missing. See *Cargill, Inc. v. Monfort of Colorado, Inc.*, 479 U.S. 104, 110 n. 5, 107 S.Ct. 484, 489 n. 5, 93 L.Ed.2d 427 (1986) ("A showing of antitrust injury is necessary, but not always sufficient, to establish standing under § 4, because a party may have suffered antitrust injury but may not be a proper plaintiff under § 4 for other reasons."). The district court decided this case on the basis of a failure to show antitrust injury and did not consider any of the other elements required for standing. We will do the same, and we will examine the cited decisions to determine their applicability where only antitrust injury is in issue.

### B.

Axis first relies on *Blue Shield of Virginia v. McCready*, 457 U.S. 465, 102 S.Ct. 2540, 73 L.Ed.2d 149 (1982), which was a § 4 standing case ("The question presented is whether a subscriber who employed the services of a psychologist has standing to maintain an action under § 4 of the Clayton Act based upon the health insurance plan's failure to provide reimbursement for the costs of that treatment."). *Id.* at 467, 102 S.Ct. at 2542. Although the Court found that the plaintiff had suffered an antitrust injury, this finding was part of its larger standing determination. In discussing *Brunswick*, the *McCready* Court refused to limit its *Brunswick* holding to a requirement that to constitute antitrust injury the plaintiff's injury must " 'reflect the anticompetitive effect' of the alleged violation." *Id.* at 482, 102 S.Ct. at 2550. Instead, *McCready* left the *Brunswick* requirement of "antitrust injury" unchanged. "Nevertheless, we agree with petitioners that the relationship between the claimed injury and that which is unlawful in the defendant's conduct, as analyzed in *Brunswick* is one factor to be considered in determining the redressability of a particular form of injury under § 4." *Id.* at 483 n. 19, 102 S.Ct. at 2550 n. 19.

Although not explicitly stated in the opinion, *Associated General Contractors, Inc. v. California State Council of Carpenters*, 459 U.S. 519, 103 S.Ct. 897, 74 L.Ed.2d 723 (1983), was also a standing case. The Court did not base its rejection of the union's claim solely on the union's failure to allege antitrust injury. The Court considered several factors that are relevant to the determination of standing—"the nature of the [plaintiff's] injury, the tenuous and speculative character of the relationship between the alleged antitrust violation and the [plaintiff's] alleged injury, the potential for duplicative recovery or complex apportionment of damages, and the existence of more direct victims of the alleged conspiracy." *Id.* at 545, 103 S.Ct. at 912. In the course of the *Associated General Contractors* opinion Justice Stevens noted that the Court had cited *Brunswick* in *McCready* to support its conclusion that "McCready's injury was of a type that Congress sought to redress in providing a private remedy for violations of the antitrust laws." *Id.* at 538, 103 S.Ct. at 909, quoting *McCready*, 457 U.S. at 483, 102 S.Ct. at 2550. Nothing in *Associated General Contractors* detracts from the *Brunswick* holding with regard to the requirement of antitrust injury.

Axis also relies on *Cargill, Inc. v. Monfort of Colorado, Inc.*, 479 U.S. 104, 107 S.Ct. 484, 93 L.Ed.2d 427 (1986). As we have noted, the Supreme Court in *Cargill* held that one seeking an injunction under § 16 of the Clayton Act to prevent a proposed merger must show a threat of antitrust injury. There the plaintiff alleged that the proposed merger would result in a concentration of economic power in the relevant markets, substantially lessening competition or tending to create a monopoly. The plaintiff further charged that this concentration would impair its ability to compete in those markets. Relying principally upon *Brunswick*, the Court concluded that the threat of lost profits following the projected merger was not sufficient to show a threat of antitrust injury. *Id.* at 116–17, 107 S.Ct. at 492–93.

Axis also contends that the district court erred in relying on *Alberta Gas Chemicals, Ltd. v. E.I. Du Pont de Nemours & Co.,* 826 F.2d 1235 (3d Cir.1987), *cert. denied,* —— U.S. ——, 108 S.Ct. 2830, 100 L.Ed.2d 930 (1988). Suit was filed in *Alberta Gas* to prevent the proposed acquisition of Conoco by Du Pont. Du Pont was the largest producer of methanol in the United States. Prior to the merger Conoco had planned to build a new plant for the production of methanol. The complaint stated that to stimulate demand for methanol while its plant was under construction, Conoco would buy methanol from the plaintiff and other producers and sell it on the merchant market. After the acquisition, Du Pont cancelled the plans for a new methanol plant. The plaintiff claimed direct injury from the loss of anticipated sales of methanol to Conoco. It claimed indirect injury from the loss of anticipated sales of methanol that would have resulted from the increased market activity induced by Conoco. The court held that the losses alleged by the plaintiff did not constitute antitrust injury.

The court assumed that the acquisition was illegal because it gave Du Pont the power to prevent Conoco from entering the methanol-producing industry as an independent competitor. In other words, it reduced competition in that industry. The court, however, found that the loss of anticipated sales from the cancelled "demand creation" activities of Conoco did "not flow 'from that which makes the defendants' acts unlawful.'" *Id.* at 1241, quoting *Brunswick,* 429 U.S. at 489, 97 S.Ct. at 697. If another entity without Du Pont's market power had acquired Conoco and curtailed its methanol plans, Alberta Gas would have suffered the same injury. 826 F.2d at 1241–42. Although there are obvious differences between the present case and *Alberta Gas,* that decision does support the district court's conclusion here.

We have not found a helpful Sixth Circuit case. In *Langenderfer, Inc. v. S.E. Johnson Co.,* 729 F.2d 1050 (6th Cir.), *cert. denied,* 469 U.S. 1036, 105 S.Ct. 510, 83 L.Ed.2d 401 (1984), one of the plaintiff's claims for treble damages was based on the defendant's acquisition of competitors. The plaintiff claimed that the acquisitions eliminated the competitive pressures of the acquired companies, thus permitting the defendant to engage in other monopolistic acts such as unfair pricing, profit squeezing and predatory bidding. *Id.* at 1058. We held that this allegation was sufficient to satisfy the *Brunswick* requirement of antitrust injury. The injury resulted "from 'anticompetitive acts made possible' by the acquisitions." *Id.* at 1058, quoting *Brunswick,* 429 U.S. at 489, 97 S.Ct. at 697. *Langenderfer* does not support Axis because Axis' exclusion from the United States armature winding machine market did not result from Micafil's acquisition of Mechaneer—the anticompetitive act. Before Micafil ever acquired Mechaneer, Axis was shut out of the desired market by the patents controlled by Possis and Globe and by the refusal of those companies to license to Axis.

In *Bayou Bottling, Inc. v. Dr. Pepper Co.,* 725 F.2d 300 (5th Cir.), *cert. denied,* 469 U.S. 833, 105 S.Ct. 123, 83 L.Ed.2d 65 (1984), the plaintiff claimed treble damages for lost profits resulting from the defendants' interference with the plaintiff's attempt to purchase a competitor. The court found that the plaintiff's losses from its failure to acquire the target company did not constitute antitrust injury. Applying *Brunswick,* the court stated:

> Bayou would have suffered the identical loss of sales, and economies of scale if [the competitor] had retained his operation or if he had sold to a third party. The injury does not satisfy either prong of the *Brunswick* test; it is not the type of injury the antitrust laws were designed to prevent and it does not flow from that which ostensibly made the defendants' activities illegal.

*Id.* at 304. The district court applied the same analysis to Axis' claim in the present case.

## C.

Many of Micafil's arguments appear to confuse antitrust injury with antitrust standing. This confusion occurs because

the two concepts "share a common ingredient." *Triple M Roofing Corp. v. Tremco, Inc.*, 753 F.2d 242, 247 (2d Cir.1985). The common ingredient is that both requirements limit "recovery to those who have been *injured by* restraint on competitive forces in the economy." *Id.*, quoting *GAF Corp. v. Circle Floor Co.*, 463 F.2d 752, 758 (2d Cir.1972), *cert. dismissed*, 413 U.S. 901, 93 S.Ct. 3058, 37 L.Ed.2d 1045 (1973) (emphasis added). Any inquiry to determine whether antitrust injury has been shown is more limited than one to determine whether the plaintiff has standing. The single determinant of antitrust injury is whether the plaintiff has suffered an "injury of the type the antitrust laws were intended to prevent and that flows from that which makes [a defendant's] act[ ] unlawful." *Brunswick*, 429 U.S. at 489, 97 S.Ct. at 697. On the other hand, even if an antitrust injury is shown sufficiently, standing may be denied on the basis of other factors. The purpose of the additional inquiries is to confine recovery to cases that promote the congressional intent to ensure that consumers receive the benefits of competitive markets.

## IV.

We agree with the district court. Viewing the complaint in the light most favorable to Axis, the complaint does not allege an antitrust injury. As Axis admitted in the complaint itself, the Possis and Globe patents precluded its entry into the U.S. market. The cases cited by Axis for the general proposition that a patent holder may violate antitrust laws by misusing his patents in an attempt to create an unlawful monopoly cast no light on the issue in this case. See *SCM Corp. v. Xerox Corp.*, 645 F.2d 1195 (2d Cir.1981), *cert. denied*, 455 U.S. 1016, 102 S.Ct. 1708, 72 L.Ed.2d 132 (1982); *Kobe, Inc. v. Dempsey Pump Co.*, 198 F.2d 416 (10th Cir.), *cert. denied*, 344 U.S. 837, 73 S.Ct. 46, 97 L.Ed. 651 (1952).

Our patent and antitrust laws seek to further different and opposing policies. Patent laws grant a monopoly for a limited time in order "[t]o promote the Progress of Science and useful Arts...." U.S. Const.

Art. I, § 8, cl. 8. Antitrust laws, on the other hand, are designed to promote and protect competition in the marketplace. Thus, a lawfully acquired patent creates a monopoly that does not violate the antitrust laws. While patent abuse may constitute an antitrust violation, *United States v. Westinghouse Electric Corp.*, 648 F.2d 642, 647 (9th Cir.1981), Axis did not allege that Micafil violated the antitrust laws by misusing its patents or licenses. It charged only that the acquisition of Possis and Mechaneer raised the barriers to its entry into the U.S. market.

This is not a case where a patent holder has attempted "to monopolize an industry by acquiring all present and future patents relevant to that industry." *Id.* Globe still owns patents and Odawara operates in the U.S. market under licenses granted by Possis to Ott prior to Odawara's acquisition of Ott. The charge that Micafil "raised the barriers" to Axis' entry into the U.S. market by acquiring Possis and Mechaneer fails to allege antitrust injury, however, since Micafil never dominated the U.S. market for armature winding machines as Xerox did the market for plain paper copying machines in *SCM Corp. v. Xerox Corp.* The *SCM* court carefully delineated the conditions under which the acquisition of patents may violate the antitrust laws and create antitrust injury for which damages may be awarded. 645 F.2d at 1205. Giving the complaint a most indulgent reading, Axis did not make such a claim in this case.

## CONCLUSION

Axis alleged no more than a causal link between Micafil's acquisition of Possis and Mechaneer and its claimed injury. What made the acquisition illegal was that by acquiring Mechaneer, Micafil further reduced competition in an industry that was already served by very few manufacturers. As did the plaintiffs in *Brunswick, Alberta Gas,* and *Bayou Bottling,* however, Axis would have suffered the same injury if Mechaneer had remained in business or if some entity other than Micafil had purchased Mechaneer. Perhaps a consumer or a competitor could state a claim for dam-

ages and injunctive relief on the basis of the Mechaneer acquisition, but Axis did not. The injury for which it sought relief was not inflicted by reason of Micafil's newly-acquired position in the market and the elimination of one competitor. The patents and licenses owned and possessed by three companies—Globe, Odawara and Micafil—not by Micafil alone, precluded Axis' entry into the U.S. market for armature winding machines. Thus, Axis' alleged injury is not "of the type the antitrust laws were intended to prevent" and it did not "flow from" the element of the acquisition that made it unlawful. *Brunswick*, 429 U.S. at 489, 97 S.Ct. at 697.

The judgment of the district court is affirmed.