**CATAPHOTE CORPORATION,**
**Plaintiff-Appellee,**

v.

**DeSOTO CHEMICAL COATINGS, INC.,**
**Defendant-Appellant.**

**No. 25118.**

United States Court of Appeals,
Ninth Circuit.

Nov. 4, 1971.

Rehearing Denied Jan. 17, 1972.

Carl Hoppe (argued), of Eckhoff & Hoppe, San Francisco, Cal., Dugald S. McDougall, of McDougall, Hersh, Scott & Ladd, Chicago, Ill., for defendant-appellant.

George B. Collins (argued), William A. Marshall (argued), of Merriam, Marshall, Shapiro & Klose, Chicago, Ill., for plaintiff-appellee.

Before MERRILL and CHOY, Circuit Judges, and POWELL,* District Judge.

CHOY, Circuit Judge:

Cataphote Corporation (Cataphote), DeSoto Chemical Coatings, Inc. (DeSoto), and Perma-Line Manufacturing Corporation of America (Perma-Line) manufacture and sell thermoplastic pavement-marking compositions used principally for highway traffic lane markings.[1] In 1962, Cataphote sued DeSoto, alleging infringement of Cataphote's patent for a thermoplastic composition (the Poole patent). DeSoto counterclaimed, alleging that Cataphote unilaterally and in concert with Perma-Line, a licensee under the Poole patent, violated Sherman Act §§ 1 and 2, 15 U.S.C. §§ 1 and 2.[2]

The District Court separated the issues, stayed the counterclaim, and without a jury tried the patent infringement claim, holding for DeSoto on the ground that the Poole patent was invalid because it had been placed in public use and sale more than one year prior to the patent application, 235 F.Supp. 936 (N.D.Cal. 1964). We affirmed. 356 F.2d 24 (9th Cir. 1966) (*Cataphote I*).

---

* The Honorable Charles L. Powell, United States District Judge, Spokane, Washington, sitting by designation.

1. The sole other manufacturer of this product was Crystalex Corporation (Crystalex), which has abandoned the field.

2. "1. Every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, * * * is declared to be illegal * * *.

"2. Every person who shall monopolize, or attempt to monopolize, or combine or conspire with any other person or persons, to monopolize any part of the trade or commerce among the several States * * * shall be deemed guilty of a misdemeanor * * *."

After trial, again without a jury, on the antitrust counterclaim, the District Court entered judgment for Cataphote and Perma-Line, holding that (1) Cataphote did not knowingly and willfully misrepresent to the Patent Office that the invention disclosed in its application had not been in public use for more than one year prior to the filing of the original application, nor had it knowingly and willfully misrepresented that Poole was the inventor; and (2) Cataphote and Perma-Line did not enter into their licensing agreement for the purpose of prosecuting an infringement action against DeSoto in furtherance of a scheme to violate the antitrust laws. DeSoto appeals. We affirm.

1. The Facts

In September 1955, Cataphote hired Arthur D. Little, Inc., to develop a substance to mark highways which would prove more durable than paint. John A. Poole, a Little employee and the nominal patentee, developed the composition for which Cataphote eventually received a patent on May 29, 1962. The patent application filed November 12, 1957, contained, under oath, the assertions that the invention had not been in public use or sale for more than one year preceding the application, and that Poole was the inventor. While Poole had invented the composition having a styrene resin binder which was covered by the original application, the application was amended to substitute a binder of alkyd resins which DeSoto now claims Poole did not in fact invent.

In the spring and summer of 1956, Cataphote had made limited "field installations" on public streets and highways of its newly developed thermoplastic compo-sition, and had received about $650 from these sales. The Poole patent was invalidated because these limited sales indicated that Cataphote was engaged in commercial development and promotion of its product and not in further experimentation. *Cataphote I* at 27.

On April 12, 1962, Cataphote entered into a licensing agreement with Perma-Line. The contract provided that Perma-Line would have the exclusive, nationwide use of the Poole patent. In return, Perma-Line agreed to pay an initial fee and an annual royalty. The license was for the life of the patent and contained an escape clause for Perma-Line should the patent be held invalid. It also included a clause requiring Cataphote, at Perma-Line's request, to prosecute any patent infringers.[3]

Prior to the licensing agreement, Cataphote had sent several letters to DeSoto, alleging infringements by DeSoto of the pending Poole patent. On September 5, 1962, Cataphote sued DeSoto. On October 12, 1962, Perma-Line, which had paid only the initial license fee, gave formal notice to Cataphote that is was suspending royalty payments until successful completion of the patent suit.[4]

2. Cataphote Alone

■ DeSoto's claim against Cataphote alone is based upon Walker Process Equipment, Inc. v. Food Machinery & Chemical Corp., 382 U.S. 172, 86 S.Ct. 347, 15 L.Ed.2d 247 (1965), in which the Supreme Court held that the knowing and willful misrepresentation of relevant facts to the Patent Office would not only invalidate a patent, but might also constitute ground for violation of § 2 of the

---

3. "In the event that PERMA-LINE shall notify CATAPHOTE in writing of infringement by others of the Letters Patent to issue on the patent application aforesaid, such infringement being sufficient materially to interfere with PERMA-LINE's business hereunder, CATAPHOTE shall take prompt action and adequate steps to abate said infringement. It is understood and agreed that CATAPHOTE shall not be required to file or undertake the prosecution of more than one (1) infringement suit hereunder at one time."

4. The following month Cataphote also sued Crystalex for infringement of the Poole patent, and obtained an injunction by Crystalex's default, enjoining further infringement.

Sherman Act.[5] To recover under *Walker,* DeSoto must prove that (1) the Poole patent was procured by knowing and willful fraud practiced by Cataphote on the Patent Office; and (2) all the elements necessary to establish a § 2 violation are present. Good faith is a complete defense.

The patent fraud proscribed by *Walker* is extremely circumscribed. In *Walker* the Supreme Court excluded from its definition of fraud "an honest mistake as to the effect of prior installation upon patentability—so-called 'technical fraud.'" *Walker, supra,* at 177, 86 S.Ct. at 350. Wholly inadvertent errors or honest mistakes which are caused by neither fraudulent intent or design, nor by the patentee's gross negligence, do not constitute fraud under *Walker.* Beckman Instruments, Inc. v. Chemtronics, Inc., 428 F.2d 555, 566 (5th Cir. 1970); Ansul Co. v. Uniroyal, Inc., 306 F.Supp. 541, 566 (S.D.N.Y.1969). The road to the Patent Office is so tortuous and patent litigation is usually so complex, that "knowing and willful fraud" as the term is used in *Walker,* can mean no less than clear, convincing proof of intentional fraud involving affirmative dishonesty, "a deliberately planned and carefully executed scheme to defraud * * * the Patent Office." Hazel-Atlas Glass Co. v. Hartford-Empire Co., 322 U.S. 238, 245, 64 S.Ct. 997, 1001, 88 L.Ed. 1250 (1944). Patent fraud cases prior to *Walker* required a rigorous standard of deceit. *See, e. g.,* Precision Instrument Manufacturing Co. v. Automative Maintenance Machinery Co., 324 U.S. 806, 816, 65 S.Ct. 993, 89 L.Ed. 1381 (1945). *Walker* requires no less.[6]

The District Court found that Cataphote had not knowingly and willfully defrauded the Patent Office. This is a determination of fact; and as we explained in *Cataphote I,* our scope of review is severely limited.[7] DeSoto urges that three misrepresentations practiced by Cataphote on the Patent Office warrant a finding of *Walker* fraud: (1) Cataphote represented that its product had not been offered to the public, when it had; (2) Cataphote alleged that Poole invented the alkyd resin compound, when he did not; and (3) Cataphote fraudulently enlarged its patent claim to include the alkyd resin substance, which had been developed by another company. However, there is ample evidence in the record to support the District Court's conclusion that none of these misrepresentations were knowingly and willfully made.

Regarding prior use of the composition, it appears that, despite negotiations with public agencies and field installations in the spring and summer of 1956, the documentary evidence indicates that the Poole thermoplastic composition underwent changes throughout 1956, was being field-tested, and was not finalized until December 14, 1956, less than one year before the application filing date. Cataphote could reasonably feel that the limited volume of sales made in the previous summer totaling at most $650 would not constitute prior use sufficient to invalidate the patent, especially in the light of continued experimentation. While reliance on counsel's advice does not conclusively establish good faith, the opinion of Cataphote's counsel that he thought there had been no patent viola-

---

5. *Walker* would undoubtedly allow recovery under § 1 of the Sherman Act, if the requisite elements were proven. Beckman Instruments, Inc. v. Chemtronics, Inc., 428 F.2d 555, 567 n. 28 (5th Cir. 1970).

6. *See Beckman Instruments, supra; Ansul Co., supra.*

7. " * * * Pursuant to Rule 52(a) * * * our obligation is to determine if the findings below were 'clearly erroneous.' This statutorily imposed standard does not vest us with power to reweigh the evidence presented at trial in an attempt to assess which items should and which should not have been accorded credibility. Our task, rather, is to determine if there exists evidence of substance to support the findings of fact of the trial court. Thus, it does not aid appellant's position on review to merely extract that evidence presented which supports its position; rather it must additionally demonstrate that no substantial evidence was presented which supports the district court findings in favor of appellee." *Cataphote I* at 26 of 356 F.2d.

tion and his recommendation to file the application although he felt there was a certain risk involved are factors to be considered when weighing the reasonableness of Cataphote's belief that it had a patentable item. We find that the District Court was not clearly erroneous in concluding that Cataphote acted in good faith in representing that its composition had not been offered to the public within one year of its filing the patent application.

Similarly, the District Court was not clearly erroneous in finding that Cataphote had not knowingly and willfully misrepresented that Poole was the inventor of the alkyd resin compound. In *Cataphote I* we said that the change to an alkyd resin patent claim from a styrene resin claim was so slight as to be unimportant. The variation was but a minor alteration of the product and added nothing that was patentable. *Cataphote I* at 27. The evidence indicates that everyone at Cataphote, including Poole himself, honestly believed that his invention covered the alkyd resin. It is unrealistic to maintain, in any sense, that Poole was not "the original, first and sole inventor" of the compound covered by the original application. Brown v. Myerberg, 314 F.Supp. 939, 945 (S.D. N.Y.1970).

■ Since in *Cataphote I* we adopted DeSoto's contention that the alkyd-styrene substitution was so minor that it introduced nothing that was patentable, DeSoto cannot now argue that but for the misrepresentation about the resin compound, the patent would not have

been granted. In other words, DeSoto failed to prove that the alleged misrepresentation was "material" to the patent. Having failed to prove materiality, DeSoto's *Walker* claim must fail. *Walker, supra,* at 177 of 382 U.S., 86 S.Ct. 347; SCM Corporation v. Radio Corporation of America, 318 F.Supp. 433, 472 (S.D. N.Y.1970).

■ Finally, the record indicates that the alkyd resin substitution did not enlarge the patent application to include other inventions. Nor would such enlargement while the patent was pending, even if intentionally made, constitute *Walker* fraud. Crown Machine & Tool Co. v. KVP-Sutherland Paper Co., 297 F.Supp. 542 (N.D.Cal.1967), aff'd on other grounds, 409 F.2d 1307 (9th Cir. 1969).

3. Cataphote and Perma-Line

■ DeSoto's last claim is that Cataphote and Perma-Line entered into their licensing agreement in order to lessen competition in violation of § 1 of the Sherman Act. DeSoto has failed at the outset to prove relevant market or that Cataphote and Perma-Line have sufficient power to monopolize.[8] *See* Times-Picayune Publishing Company v. United States, 345 U.S. 594, 73 S.Ct. 872, 97 L. Ed. 1277 (1953); Cornwell Quality Tools Company v. C.T.S. Company, Inc., 446 F.2d 825 (9th Cir. 1971); Case-Swayne Company v. Sunkist Growers, Inc., 369 F.2d 449 (9th Cir. 1966), rev'd on other grounds, 389 U.S. 384, 88 S.Ct. 528, 19 L.Ed.2d 621 (1967). Nor has

8. DeSoto's efforts to prove that the relevant market is solely the thermoplastic marking market are unconvincing. The relevant market here is not so circumscribed, but includes all highway marking devices, be they thermoplastic compounds, paints, adhesive tapes or raised discs. All these products are "reasonably interchangeable by consumers for the same purposes" United States v. E. I. Du Pont De Nemours & Co., 351 U.S. 377, 395, 76 S.Ct. 994, 1007, 100 L.Ed. 1264 (1956). There is substantial evidence in the record that in such a relevant market, Cataphote either singly, or in combination

with Perma-Line was impotent to monopolize anything. Cataphote with total sales of $2.5 million is clearly not the giant in an industry which includes DeSoto which had total sales of over $100 million at the time of trial. DeSoto is one of the country's largest paint manufacturers, and paint comprises approximately 98% of the entire pavement marking market. One local survey demonstrated that the combined use of thermoplastic, preformed plastic, and raised buttons was only 1.8% of paint. Cataphote simply does not have the power, even with the Poole patent, to exclude actual or potential competition.

DeSoto proved injury to its business.[9] Additionally, there is ample evidence in the record to support the District Court's finding as not clearly erroneous. The license agreement for the Poole patent is a standard type of exclusive license containing standard provisions. A patentee has the untrammeled right to suppress his patent or to grant an exclusive or nonexclusive license. Bement & Sons v. National Harrow Co., 186 U.S. 70, 94, 22 S.Ct. 747, 46 L.Ed. 1058 (1902). That the Cataphote-Perma-Line license was exclusive is neither unusual nor sinister.

Similarly, there is nothing suspicious about the requirement that Cataphote bring suit against alleged infringers. Without this guarantee Perma-Line's exclusive license would be worth considerably less than it agreed to pay for it. Cataphote, as the patentee, would be in a much better position to handle the intricacies of patent litigation than would Perma-Line, the licensee. While the suit against DeSoto was instituted after the licensing agreement was signed, it was plainly foreshadowed by Cataphote's numerous letters to DeSoto complaining of alleged infringement. DeSoto's sudden entrance into the marketplace with a product remarkably similar to Cataphote's was enough to prompt the latter to investigate patent infringement and to institute its suit even before Perma-Line gave formal notice to sue under the contract. Nor is there any evidence that Perma-Line knew of the defects in Cataphote's patent application. Its action suspending royalty payments while urging Cataphote to prosecute the patent suit against DeSoto was a reasonable action taken to protect a business investment.

■ It is true that certain collaboration by businessmen to restrain access to or competition in a market is illegal *per se*, no matter what the lawful in-

terest or economic or business rationale involved. United States v. General Motors Corp., 384 U.S. 127, 86 S.Ct. 1321, 16 L.Ed.2d 415 (1966). But we do not find such unlawful collaboration here. In *General Motors*, the Supreme Court condemned as illegal *per se* a conspiracy between General Motors and its franchised dealers in the Los Angeles area to eliminate the competition offered by discount car merchants. The Court found pervasive joint and collaborative action in the initiation, execution, and fulfillment of the plan, extensive private policing of the arrangement, a concerted refusal to deal with the discounters, and substantial price-fixing. With these facts economic excuses, good faith, and business interests were clearly irrelevant. *Compare* Klor's, Inc. v. Broadway-Hale Stores, Inc., 359 U.S. 207, 79 S.Ct. 705, 3 L.Ed.2d 741 (1959) with Joseph E. Seagram & Sons, Inc. v. Hawaiian Oke & Liquors, Ltd., 416 F.2d 71 (9th Cir. 1969).

■ ■ The Cataphote-Perma-Line agreement can not be characterized as illegal *per se*. It is not one of those " * * agreements or practices which because of their pernicious effect on competition and lack of any redeeming virtue are conclusively presumed to be unreasonable and therefore illegal without elaborate inquiry as to the precise harm they have caused or the business excuse for their use." Northern Pacific Railroad Co. v. United States, 356 U.S. 1, 5, 78 S.Ct. 514, 518, 2 L.Ed.2d 545 (1958). The good faith of the parties is relevant to a determination of the reasonableness of a restraint on trade, and the record indicates that the acts of Cataphote and Perma-Line were not done with the intent to violate the antitrust laws, but in good faith for valid business reasons. DeSoto's reliance upon United States v. Singer Manufacturing

---

9. The statute under which DeSoto sues states, "Any person who shall be injured in his business or property by reason of anything forbidden in the antitrust laws may sue therefor * * * " 15 U.S.C. § 15. DeSoto's right to seek private relief depends not on Cataphote's illegal conduct but upon actual damage to De-

Soto's business. It has not proved such damage and therefore cannot recover. Winckler & Smith Citrus Products Co. v. Sunkist Growers, Inc., 346 F.2d 1012, 1014 (9th Cir. 1965). Since we find no antitrust liability, we need not decide if DeSoto's attorneys' fees and costs incurred in *Cataphote I* are recoverable.

Co., 374 U.S. 174, 83 S.Ct. 1773, 10 L.Ed.2d 823 (1963) is misplaced. *Singer* held illegal a cross-licensing scheme, the "overriding common design" of which was to exclude Japanese sewing machines from the American market, which Singer already dominated. Singer and its two European competitors conspired to enforce their patents for the benefit of all three parties. *Singer*, the sole American company which would enforce the patents, was the depository for the legal rights of all the parties. Here the evidence does not approximate the clear and substantial nature of the transgressions in *Singer*. Cataphote and Perma-Line were in no position to dominate the highway marking market, alone or in concert. They acted in good faith. The District Court was correct in finding that Cataphote and Perma-Line had not engaged in conduct illegal under the Sherman Act.

Affirmed.