CHAPARRAL INDUSTRIES, INC., Plaintiff,

v.

BOMAN INDUSTRIES, INC., Defendant.

No. 83–7215 JGD.

United States District Court, C.D. California.

May 24, 1988.

William J. Robinson, Poms, Smith, Lande & Rose, Los Angeles, Cal., Lewis H. Eslinger, Ned W. Branthover, Cooper & Dunham, New York City, for Chaparral Industries, Inc.

Roderick G. Dorman, Kirk D. Dillman, Augustini, Wheeler & Dorman, Los Angeles, Cal., Russell R. Palmer, Jr., Christie, Parker & Hale, Pasadena, Cal., for Boman Industries, Inc.

## OPINION

DAVIES, District Judge.

This patent infringement suit was brought by Chaparral Communications, Inc. (Chaparral) against Boman Industries, Inc. (Boman). Chaparral claims infringement under 35 U.S.C. § 271. The action was tried to the Court commencing July 7, 1987.

### The Issues

The complaint was filed on November 7, 1983. Four claims for relief were stated, including infringement by Boman of Chaparral's U.S. Patent 4,414,516. On October 6, 1984, Chaparral filed its First Amended and Supplemental Complaint reasserting its original claims and adding others.

On January 28, 1986, the Honorable Pamela Ann Rymer ruled on Boman's Motion for Partial Summary Judgment on certain issues and claims central to Chaparral's Supplemental Complaint. Judge Rymer granted summary judgment on Count Two, infringement of the design patent (U.S. Patent No. 272,910); Count Three, trademark infringement; and Count Five, false designation of origin. The motion was denied on Count One, infringement of the utility patent.

This ruling, coupled with certain stipulations of the parties, limited the trial of the action to the issues raised by Chaparral's first cause of action for infringement and Boman's first counterclaim for invalidity of the patent. The issues for trial were clearly defined in the Pre-Trial Conference Order, filed October 27, 1986, although amended during trial.[1]

The issues reduce themselves to two: (1) Is the Howard patent invalid or unenforceable because (a) it is an obvious variation of a prior patent, or (b) the patent was secured through fraudulent or inequitable conduct, and (2) does the Boman polarized feedhorn with the curved probe ("Probe B") infringe the Howard patent.

Pursuant to Fed.R.Civ.P. 42(b), the issues of damages and attorneys' fees were bifurcated. Thus, the trial was confined to the liability issues.

### Background

Current satellite technology has made it possible for the consumer to receive entertainment television signals from earth-orbiting satellites on home television receivers. The devices that receive these satellite signals are dish antennae, known as "earth stations." The market for these systems is known as the television receiver only ("TVRO") market. The polarized feedhorns at issue in this case are an integral part of this new technology since each earth station is equipped with a polarized feedhorn.

Earth-orbiting satellites receive radio signals transmitted by ground base facilities,

---

1. Those issues are:
 1. Do Boman EFH–75b and EFH–75t polarized feedhorns, having a probe referred to as a "Probe B," infringe claims 1–6 and claims 10–15 of Chaparral Patent No. 4,414,516 literally and/or under the Doctrine of Equivalents?
 2. Does Probe B avoid claims 1–6 and claims 10–15 of said patent because of the prosecution history of the patent?

3. Are the claims of the Chaparral patent No. 4,414,516 invalid and unenforceable under 35 U.S.C. §§ 103 and 112?
4. Did Chaparral engage in fraudulent or inequitable conduct before the United States Patent and Trademark Office in obtaining said patent?

and then retransmit the signals at extremely high frequencies and very low power, a process known as microwave transmission. The signals are entertainment television signals directed to the consumer television entertainment market.

The signals retransmitted by satellite are in the frequency band of 3.7 to 4.2 gigaHertz and, when they reach Earth, cover a wide geographical area, known as a "footprint." Because of the high number of television channels per satellite signal, the earth station must be capable of receiving signals at each frequency within the frequency band. An earth station which does not function properly over the entire frequency band will either lose some television channels or those channels will not be properly viewable on the television set.

The earth station is an antenna which is dish-shaped and circular with a parabolic reflecting surface. Microwave signals "fall" onto the parabolic antenna surface and are deflected to a single focal point where the feedhorn is located. The feedhorn gathers the signals and conveys them to a low noise amplifier and then to a television receiver for viewing.

When earth stations first appeared on the market, incoming satellite signals were polarized to orient in a single plane, because only a few broadcasters transmitted television signals by microwave transmission. As the TVRO market expanded, transmission by satellite increased so that earth-orbiting satellites retransmitted signals covering twenty-four television channels within the 500 megahertz transmission bandwidth. This was accomplished through a process known as "cross-polarization," in which the signal transmitted by satellite is characterized by 12 separate channels polarized in one plane, and another 12 channels polarized in a perpendicular plane.

The earth stations must select for reception one of the two available planes of polarization before choosing a television channel. A feedhorn capable of making the selection between the two available planes is known as a polarized adjustable antenna receiving horn, or simply a "polarizer".

The earliest polarizers were wireless. However, they were not practically available to the TVRO market because of their expense. Furthermore, wireless polarizers were cumbersome because they had to be turned to adjust to the desired polar plane.

The polarizer with a rotating wire probe was the solution to these problems. A wire probe contains three sections, a receiving probe on one end, a launch probe on the other end, and a transmission line connecting the receiving and launch probes. Electromagnetic energy is focused by the antenna into the cylindrical portion of the feedhorn, known as the cylindrical waveguide. The receiving probe, which is perpendicular to the incoming signals, collects the energy and transmits it through the transmission line to the launch probe. The launch probe then redirects the energy towards the rectangular portion of the feedhorn, known as the rectangular waveguide.

A polarizer must receive and convey focused signal energy efficiently, with as little loss of energy as possible, in order to maintain signal strength over the entire satellite frequency band. Minimization of energy loss requires attention to "impedance-matching" in the feedhorn. Proper impedance-matching ensures the efficient collection by the receiving probe of the signal energy directed to the cylindrical waveguide, the efficient transfer of that energy through the launch probe into the rectangular waveguide, and the radiation of the signal from the rectangular waveguide to the low noise amplifier and the television receiver.

### The Howard and Boman Feedhorns

Chaparral claims that H. Taylor Howard is the inventor of U.S. Patent 4,414,516 (the "Howard" patent), issued on November 8, 1983. This patent covers a polarizing feedhorn, consisting of two hollow waveguides and a wire probe. The wire probe has been referred to in this action as "Probe A."

The Howard system involves the innovative use of a wire probe set in dielectric material and rotated by a small servo motor. The wire probe provides broad band

performance. Prior to the Howard invention, wire polarizers were unable to conduct the signal from the circular waveguide to the rectangular waveguide without losing signal strength over some portion of the frequency bandwidth. As a result, certain television channels were subject to being lost or impaired unless adjustments were made in the waveguides. Two prior systems that were plagued by this problem were the Murphy probe system of U.S. patent 2,880,399, and the Augustin probe system shown as prior art in Figure 1. The Howard system solved the problems faced by this prior art by utilizing two transmission line sections instead of one. The result was consistent signal conduction over the entire frequency bandwidth. Figures 1 and 2 taken from the utility patent demonstrate these differences.

Fig. 1
Prior Art
(AUGUSTIN)

RECTANGULAR WAVEGUIDE

ROTATABLE DIELECTRIC ROD

TRANSMISSION LINE SECTION

CYLINDRICAL WAVEGUIDE

PROBE

RECEIVER PROBE PORTION

LAUNCH PROBE PORTION

Fig. 2
(HOWARD)

RECTANGULAR WAVEGUIDE

CYLINDRICAL WAVEGUIDE

ROTATABLE DIELECTRIC ROD

REAR WALL TRANSMISSION LINE SECOND SECTION

PROBE

RECEIVER PROBE PORTION

LAUNCH PROBE PORTION

TRANSMISSION LINE FIRST SECTION

When the complaint was filed on November 7, 1983, Boman was marketing a polarized feedhorn called the "EFH–75" and containing a wire probe with the identical "Probe A" shape as the Howard system. Robert Maniaci, President of Boman and Chief Executive Officer, learned shortly after November 7, 1983, that a patent had been issued to Howard. Boman stopped production and recalled rotary polarizers that were in the hands of distributors. Boman removed the Howard-style probes

from the recalled feedhorns and replaced them with a differently shaped curved probe, which has been referred to as "Probe B" in this action. By the end of November 1983, Boman was shipping polarizers with "Probe B" probes. The Boman feedhorn with the curved probe is illustrated below:

The claimed infringement, expressed in general terms, is that the performance and function of the "Probe A" and "Probe B" polarizers are essentially the same. The Boman polarizer with the "Probe B" achieved the same results as the Chaparral polarizer with the "Probe A." The issue for this Court is whether the circular probe utilized by Boman after the filing of this action infringes the Howard patent.

*Discussion*

*Patent Validity and Enforceability*

Before determining whether the Howard patent was infringed, the Court must decide whether the patent is valid and enforceable. Boman asserts that the Howard patent is invalid and unenforceable for two reasons: (1) The Howard patent is an obvious variation of the Augustin probe; and (2) the patent was secured through fraudulent and inequitable conduct. The Court concludes that Boman has failed to meet its burden of proof in either respect. The Howard patent is not an obvious variation of the Augustin design, and neither Howard nor his attorney are guilty of fraud or inequitable conduct in securing the Howard patent.

A patent is presumed valid. 35 U.S.C. § 282; *Bausch & Lomb, Inc. v. Barnes-Hind/Hydrocurve*, 796 F.2d 443, 446 (Fed. Cir.1986), *cert. denied*, — U.S. —, 108 S.Ct. 85, 98 L.Ed.2d 47 (1987). Boman, in challenging the Howard patent, had the burden at trial of producing "clear and convincing" evidence sufficient to overcome the presumption of validity. *Jones v. Hardy*, 727 F.2d 1524, 1528 (Fed.Cir.1984); *SSIH Equipment S.A. v. U.S. Intern. Trade Com'n*, 718 F.2d 365 (Fed.Cir.1983). Boman failed to produce clear and convincing evidence sufficient to overcome the presumption that the Howard patent is valid.

(1) *Obviousness*

■ Boman alleges that every feature of the Howard system was obvious at the time of the invention. A finding of obviousness under 35 U.S.C. § 103 requires a showing that "the differences between the subject matter sought to be patented and the prior art are such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art to which said subject matter pertains." 35 U.S.C. § 103.

In applying this test, three factual inquiries must be made by the Court: 1) the scope and content of the prior art; 2) the differences between the prior art and the claims at issue; and 3) the level of ordinary skill in this art. *Graham v. John Deere Co.*, 383 U.S. 1, 17–18, 86 S.Ct. 684, 693–94, 15 L.Ed.2d 545 (1966). Secondary factors, such as the commercial success of the claims at issue, the failure of others to produce a similar invention, and the subsequent copying by others once the patent issues, should be considered by the Court in determining obviousness. *Id.* When evidence regarding such secondary factors is presented, the Court must consider the evidence, although "such evidence 'is not *necessarily* conclusive.'" *Fromson v. Advanced Offset Plate, Inc.*, 755 F.2d 1549, 1557 (Fed.Cir.1985) (citations omitted) (emphasis in original).

In this case, the prior art consists of the Augustin patent, the Murphy patent, and the evidence produced at trial by Boman of publications in technical journals pertaining to elements of the Howard patent. The Augustin polarizer and the Murphy polarizer are similar to the Howard system in that each consists of two probe, waveguide to waveguide systems involving the utilization of a transmission line. However, the important distinctions of the Howard patent are the positioning of the probe transmission line parallel with and in close proximity to the walls of the waveguide, the sectioning of the transmission line, and the low and uniform impedance. Howard successfully combined elements found in the prior art and the result was improved performance, although nothing in the prior art suggested this combination. "Virtually all inventions are combinations and virtually all are combinations of old elements." *Environmental Designs, Ltd. v. Union Oil Co. of California*, 713 F.2d 693, 698 (Fed. Cir.1983), *cert. denied*, 464 U.S. 1043, 104 S.Ct. 709, 79 L.Ed.2d 173 (1984). Where nothing of record plainly indicates that it would have been obvious to combine previously separate process steps into one process, it is legal error to conclude that a claim to that process is invalid under § 103. *Fromson*, 755 F.2d at 1556.

Howard's invention differs from the Augustin feed in the shape of the probe. This distinction is important because the proximity of each probe transmission line section to one of the two waveguide walls, and the fact that each transmission line section is parallel to each wall, produces a low and uniform impedance.

At trial it was demonstrated that the Howard invention differs substantially from prior art and the claims of the Augustin patent. Although Boman acquired permission to market the Augustin patent in 1982, Boman instead chose to infringe the Howard patent by marketing feedhorns with the infringing probe. These facts adequately demonstrate the differences between the Augustin and Howard patents, and establish the superiority of the Howard invention.

The person of ordinary skill in the art is presumed to be aware only of pertinent art which would reasonably be considered to contain solutions to the problems facing the inventor at the time the invention was made. *Standard Oil Co. v. American Cyanamid Co.*, 774 F.2d 448, 454 (Fed.Cir.1985). In determining the level of ordinary skill in the art, the court may consider factors such as: 1) the type of problems encountered in the art; 2) prior art solutions to those problems; 3) the rapidity with which innovations are made; and 4) the educational levels of active workers in the field. *Environmental Designs*, 713 F.2d at 696.

The TVRO market is relatively new, and did not begin to develop until 1979. Most, but not all, of the participants in this field held a four-year electrical engineering degree in microwave signals. Some companies, including Boman, entered the market with no employee holding an electrical engineering degree. Nevertheless, those participating in the home satellite reception industry could have readily learned about the field, and could easily keep pace with the industry's rapid progression and expansion.

Members of the community wishing to compete in the high volume, low cost mar-

ket of providing inexpensive microwave feedhorns probably were aware of the Murphy and Augustin systems. The technical and educational training required to understand these systems does not involve a high degree of sophistication. Therefore, if the claims or combinations of elements entailed in the Howard invention had been obvious from the teachings and suggestions of the Murphy and Augustin systems, an industry member possessing the ordinary level of skill in this field would have been able to understand and to develop these claims.

Furthermore, several innovators in the industry, such as Robert Luly and Harry Greenberg, made numerous unsuccessful attempts to overcome the impedance problems inherent in the prior art. Had the Howard claims been obvious at the time that Luly and Greenberg attempted to create their own probe systems, Luly and Greenberg would not have encountered such difficulties.

By creating a process which overcame impedance problems, the Howard system introduced a solution to a problem which had troubled the industry for some years. The elements constituting the Howard system were not obvious to members of the microwave signal reception community at the time Howard invented his polarizer. Thus, Boman has provided no basis for showing how someone possessing the ordinary skill in the art would have been lead to the Howard invention.

Moreover, secondary factors, such as the commercial success of the Howard invention and the copying of the Howard system by others in the industry, support this conclusion of nonobviousness. The industry was well aware of the immediate commercial success of the Howard system. Since its introduction in the marketplace, the Howard patent has been the cornerstone of Chaparral's business, its success being due primarily to the low signal loss, and the broad band signal response of the Howard probe. Companies such as Channel Master Corporation, which had been unsuccessful in developing their own probes, selected the Chaparral feedhorn for use with their earth stations. Competitors, recognizing Chaparral's success, began to include "Probe A" in their own polarized feedhorns, resulting in numerous infringement suits by Chaparral. All of these competitors, with the exception of Boman, respected Chaparral's rights by discontinuing the infringing activity. Thus, the commercial success of the Howard probe and the subsequent copying of "Probe A" by others objectively demonstrates that the Howard invention was not obvious at the time it was invented.

The Court finds that the Howard invention constitutes a new and unique solution to problems that had previously troubled other inventors in the field. The Howard invention produced a rotatable wire probe that responded electrically over the entire frequency band of interest for satellite television. Other inventors had tried, but failed, to achieve the same result. The benefits which flowed from the improvements that the Howard invention brought to the art include the elimination of mechanical disadvantages of earlier rotators and the substantial reduction of signal loss.

Boman has failed to carry its burden of showing by clear and convincing evidence that the subject matter of the Howard patent would have been obvious to a person of ordinary skill in the art at the time the invention was made. Therefore, the Court, having considered the scope and content of the prior art, the difference between the prior art and the claims at issue, the level of ordinary skill in the pertinent art and the objective indicia of nonobviousness, concludes that the Howard patent is nonobvious.

(2) *Fraudulent or Inequitable Conduct Before the U.S. Patent and Trademark Office*

■ Two categories of defenses exist to challenge the conduct of a patentee before the United States Patent and Trademark Office ("Patent Office"): (1) "fraud", which renders the patent invalid, and (2) "inequitable conduct", which renders the patent unenforceable. *J.P. Stevens & Co., Inc. v. Lex Tex Ltd., Inc.*, 747 F.2d 1553, 1560 (Fed. Cir.1984). Boman asserts that

Chaparral committed both "fraud" and "inequitable conduct" before the Patent Office during the course of its prosecution of its application for the utility patent.

 To establish fraudulent misconduct sufficient to invalidate the Howard Patent, Boman must show that a material misrepresentation was made by Howard and that Howard had knowledge of its falsity. *See Cataphote Corp. v. DeSoto Chemical Coatings, Inc.*, 450 F.2d 769 (9th Cir.1971), *cert. denied*, 408 U.S. 929, 92 S.Ct. 2497, 33 L.Ed.2d 341 (1972); *Beckman Instruments, Inc. v. Chemtronics, Inc.*, 428 F.2d 555 (5th Cir.1970). This element can be satisfied with proof of the intentional withholding of a material fact from the Patent Office. *Orthopedic Equipment Co., Inc. v. All Orthopedic Appliances, Inc.*, 707 F.2d 1376, 1383 (Fed. Cir.1983). Boman has the burden of establishing fraud on the Patent Office by "clear and convincing" evidence. *See Walker Process Equipment, Inc. v. Food Machinery & Chemical Corp.*, 382 U.S. 172, 86 S.Ct. 347, 15 L.Ed.2d 247 (1965); *Kansas Jack, Inc. v. Kuhn*, 719 F.2d 1144 (Fed. Cir.1983).

 Boman failed to meet its burden in this respect. There was no proof at trial, by clear and convincing evidence, that Chaparral misrepresented material prior art. Boman asserts that the findings made by Judge Rymer in her ruling upon Boman's motion for partial summary judgment should be considered as evidence of concealment fraud in that she found Chaparral failed to disclose to the Patent Office the Yang patent and material information on function. However, these findings relate to, and are restricted to, the design patent, U.S. Patent No. 272,910, and have no effect upon the issues tried in this part of the suit.

Boman further claims that Chaparral materially misrepresented the Augustin prior art. In the Augustin feedhorn, the dielectric encasing the probe protruded into the cylindrical waveguide. The prior art drawing provided by Howard (Figure 1) failed to disclose this feature. In light of the features of the Howard probe and its differ-

ences to the Augustin probe, the protrusion of the dielectric into the cylindrical waveguide is not material information. No reasonable examiner would consider it important in deciding whether to allow the application to issue the patent. 37 C.F.R. § 1.56(a). At best, the failure to depict in Figure 1 the protrusion of the dielectric into the cylindrical waveguide is negligence, and thus insufficient grounds to support an invalidity or unenforceability claim. *J.P. Stevens & Co.*, 747 F.2d at 1560.

 Having failed to demonstrate that the patent should be invalidated due to fraud, Boman must satisfy a two-prong test to establish inequitable conduct before the Patent Office. *J.P. Stevens & Co.*, 747 F.2d at 1559–60. The Howard patent is unenforceable if Boman can demonstrate, by clear and convincing evidence, a material misrepresentation or omission of information, and that a threshold level of intent was present on the part of the applicant. *AKZO N.V. v. U.S. Intern. Trade Com'n*, 808 F.2d 1471, 1481 (Fed. Cir.1986), *cert. denied*, — U.S. —, 107 S.Ct. 2490, 96 L.Ed.2d 382 (1987). The applicable test of materiality "is whether a reasonable examiner would consider the omission or misrepresentation important in deciding whether to issue the patent." *Id.* Materiality and intent must be considered together. The less material the omission or misrepresentation, the more culpable the intent must be to reach a conclusion that the patent should be unenforceable. *American Hoist & Derrick Co. v. Sowa & Sons, Inc.*, 725 F.2d 1350, 1363 (Fed. Cir.), *cert. denied*, 469 U.S. 821, 105 S.Ct. 95, 83 L.Ed.2d 41 (1984).

 Boman claims that two declarations submitted by Chaparral to the Patent Office during the prosecution of the Howard patent contained misrepresentations and that the filing of these declarations constitutes fraudulent or inequitable conduct sufficient to invalidate the Howard patent.

Howard retained attorney F. David LaRiviere to prepare the patent application and

to present it to the Patent Office. On September 13, 1982, Howard filed a Petition to Make Special, seeking to have the patent application processed in an expedited fashion. Appended to this Petition was a declaration by LaRiviere, representing that a careful and thorough search of prior pertinent art had been made. LaRiviere stated his belief that all of the claims were allowable.

The Patent Office rejected certain claims in the Petition because they were indefinite. A resubmitted application was rejected on June 8, 1983. A further amended application, as allowed under 37 C.F.R. § 1.116, was filed on June 20, 1983, in which claim 15 was cancelled. On June 27, 1983, the examiner caused the Notice of Allowability to issue and be mailed.

Specifically, Boman attacks the declaration submitted by Chaparral's patent attorney F. David LaRiviere on August 30, 1982, which accompanied Chaparral's "Petition to Make Special," in which LaRiviera stated (a) that he had "caused" a "careful and thorough search of the pertinent prior art" to be made, and (b) that he believed all of the claims in the application were allowable. Boman also attacks Howard's declaration of May 7, 1983, in which Howard stated, "My invention provides clearly superior, by several orders of magnitude, performance characteristics than the prior art."

First, no evidence was presented that LaRiviere failed to conduct a careful and thorough prior art search. On the contrary, the evidence shows LaRiviera frequently consulted both technological journals and Howard for instruction on the status of relevant prior art.

■ Second, Howard's statement that his invention was "clearly superior, by several orders of magnitude" is an inventor's hyperbole. No reasonable patent examiner would have relied on this statement as meaning anything more than that Howard believed his invention was a significant improvement of previous art. Howard's test results, included with the raw data and calculations attached to his declaration, showed that the invention was superior in

that the probes demonstrated great improvement in performance. These test results were accurate and not misleading. Therefore, a reasonable patent examiner would not have been mislead by Howard's statements.

No reasonable basis has been presented for claiming that either Howard or LaRiviera misrepresented any fact to the Patent Office concerning prior art. Furthermore, given that both Howard and LaRiviera consulted prior art during the pending application period, and since Boman has not shown why either was not justified in relying on their research, the evidence demonstrates that Howard and LaRiviere had a good faith belief that the claims in the application were distinct from the prior art and therefore patentable. "[S]imple negligence, oversight, or an erroneous judgment made in good faith, is insufficient to establish the requisite intent." *J.P. Stevens & Co.*, 747 F.2d at 1560.

Boman undertook a substantial burden by challenging the validity of the patent, and it has failed to meet that burden. At most the claims of fraud arising from the failures of Howard's counsel are nothing more than poor craftsmanship in the preparation of the application, and its prosecution to the Patent Office.

Boman has failed to prove any material misrepresentations in the Patent Office, and has also failed to prove either intent or any unfounded, bad faith belief in the validity of the claims. Thus, Boman has failed to meet its burden of proving inequitable conduct or fraudulent procurement before the Patent Office. Accordingly, the Chaparral patent will not be invalidated based on these claims.

*Infringement of the Howard Patent*

■ Literal infringement requires that the accused device "embody every element of the claim as properly interpreted. If the claim describes a combination of functions, and each function is performed by a means described in the specification or an equivalent of such means, then literal infringement holds." [citations omitted] *Texas Instruments v. U.S. International Trade*

*Commission,* 805 F.2d 1558, 1562 (Fed.Cir. 1986).

 In late 1981, Boman entered the satellite television field. Since August 1982 Boman has sold a polarizer known as the Model EH–75 which contains a rigid rotatable wire probe. Until December 1983, after this lawsuit had been filed, the EH–75 contained a probe which was functionally identical to the "Probe A" in the Howard patent. Boman admitted that it infringed the Howard patent by manufacturing and selling its EH–75 polarizer with the "Probe A" probe.

In late November 1983, Boman began to produce polarizers with "Probe B" probes, and marketed these polarizers until August 1984. The Court finds that "Probe B" used in Boman's EH–75 polarizers has the following characteristics, which literally infringe the Howard claims:

1) "Probe B" is a signal conductor which has a receiver probe in the circular waveguide perpendicular to the circular waveguide's axis, receiving one polarization of the incident signal.

2) "Probe B" has a launch probe portion concentric with the insulator rod and extending into the rectangular waveguide for launching the signal received in the circular waveguide.

3) "Probe B" has a transmission line contoured to the inside surface of the circular wall, substantially parallel to the axis of the circular waveguide.

4) The transmission line also is contoured to the inside surface such that it is substantially parallel to the plane of the rear wall of the circular waveguide for connecting the receiver probe portion to the launch probe portion.

5) "Probe B" is fixedly mounted in the insulator rod concentric with the axis of rotation.

The above five features of the Boman polarizer literally infringe Howard claims 1–6 and 10–15.

The "Probe B" transmission line moves through the same fields or areas within the circular waveguide as those through which the "Probe A" transmission line rotates. As a result, both transmission lines are able to overcome the same degree of impedance factors. "Probe B" and "Probe A" are both designed to bend and run along the back wall of the circular waveguide. This helps the probes avoid large shunting capacitance formerly experienced with the Augustine system. Thus, the "Probe B" transmission line performs as functionally parallel to the circular waveguides as does the "Probe A" transmission lines covered in the Howard claims. The "Probe B" transmission line is therefore substantially parallel to the waveguide walls, and is literally covered by the language of the claims in the Howard patent.

Furthermore, the court cannot agree with Boman's contention that "Probe B" avoids infringement because the curved shape of "Probe B" is not the same shape as the Howard "Probe A". A curve may schematically be broken into a series of lines connected in a pattern of right angles. Theoretically, such a series of orthoganal lines would be parallel to one or the other of the circular waveguide walls. If Boman's curve design is viewed from this perspective, the series of lines composing the transmission line would be substantially parallel within the coverage of claim one. The Supreme Court faced a similar case in which an infringer sought to avoid a patent involving a curved shape guide by instead using a "guide crooked by a broken line." *Ives v. Hamilton,* 92 U.S. 426, 23 L.Ed. 494 (1875). The Supreme Court found infringement because the design was "too transparent an imitation to need a moment's consideration." Likewise in this case, the curved probe is no more than an imitation of the angled probe. The curved shape of Boman's "Probe B" does not avoid the fact that the Boman probe performs essentially the same functions by utilizing essentially the same design features as the Howard patent. Boman has not proven that the curvature in the probe improves the design in any way. For these reasons, Boman's curved probe cannot avoid literal infringement of the Howard patent.

*Doctrine of Equivalents*

 Moreover, even if the Boman polarizer did not literally infringe the Howard

patent, the Court finds that it infringed the Howard patent under the Doctrine of Equivalents. Boman's "Probe B" polarizers infringe Claims 1–6 and 10–15 of the Howard patent under the Doctrine of Equivalents because the Boman polarizer and the Howard polarizer perform substantially the same function in substantially the same way to provide substantially the same results. *Loctite Corp. v. Ultraseal Ltd.*, 781 F.2d 861 (Fed.Cir.1985).

"Probe A" and "Probe B" perform the same functions. Both probes:

a) detect a selected polarity of a low energy polarized microwave signal reflected from a large dish antenna within a circular waveguide;

b) transmit the detected signal from the circular waveguide into the rectangular waveguide;

c) have transmission lines which couple the circular waveguides and rectangular waveguides by a rotatable wire probe capable of being oriented to detect a selected signal polarity;

d) have transmission lines which maintain relatively constant impedance;

e) have transmission lines which bend to run along the back wall of the circular waveguide, thus avoiding the large shunting capacitance experienced in the Augustin system;

f) have transmission lines which connect to the receiving probe at a point close to the sidewall of the circular waveguide, avoiding the large end-effect capacitance caused by fringing electric fields characteristic in Augustin systems.

Thus, "Probe B" and "Probe A" function in substantially the same way and achieve substantially the same results. "Probe B" is functionally similar to "Probe A" in that it is able to achieve broad band signal performance without the additional use of impedance matching elements such as turning screws and cables. "Probe B" and "Probe A" are each inherently substantially frequency independent over the frequency bands of interests. Therefore, "Probe B" performs substantially the same function in substantially the same way to achieve sub-

stantially the same results as "Probe A". Under the Doctrine of Equivalents, Boman's polarizer using "Probe B" infringes Claims 1–6 and 10–15 of the Howard patent.

*Willful Infringement*

Having found that Boman's polarizer using "Probe B" infringed the Howard patent, the Court must decide whether such infringement was willful and deliberate. If such willful and deliberate conduct is found, 35 U.S.C. § 284 permits the Court to award up to three times the amount of damages. "The role of a finding of 'willfulness' in the law of infringement is partly as a deterrent—an economic deterrent to the tort of infringement—and partly as a basis for making economically whole one who has been wronged...." *Rite–Hite Corp. v. Kelley Co., Inc.*, 819 F.2d 1120, 1126 (Fed.Cir.1987).

Willfulness is determined by considering the totality of the circumstances. *Id.* at 1125. Relevant factors to consider include: (1) whether the infringer knew of the patent, *State Industries, Inc. v. A.O. Smith Corp.*, 751 F.2d 1226, 1236 (Fed.Cir. 1985); (2) whether the infringer "deliberately copied the ideas or designs of another," *Bott v. Four Star Corp.*, 807 F.2d 1567, 1572 (Fed.Cir.1986); and (3) whether the infringer had a good-faith belief that the acts did not constitute infringement, *Underwater Devices Inc. v. Morrison-Knudsen Co., Inc.*, 717 F.2d 1380, 1389–90 (Fed.Cir.1983). "Good Faith" includes consideration of whether the infringer obtained a legal opinion, and whether or not the infringer relied on or ignored this advice. *Id.*

Boman learned of the issuance of the Howard patent on November 8, 1983. Boman also knew that its original Model EH–75 polarizer used an infringing probe, and Boman admits to this infringement. The present lawsuit prompted Boman to stop manufacturing and selling its polarizer until an adequate replacement probe could be found.

By early December 1983, Boman began producing "Probe B" EH–75 polarizers. It

sold them in this country until August, 1984. Boman knew that "Probe B" performed as well as "Probe A". Boman also was aware that the Howard claims literally covered "Probe B". Furthermore, Boman knew that "Probe B" was the functional equivalent of "Probe A", and would no more avoid infringement than Boman's earlier discontinued probe. Therefore, Boman knew that the "Probe B" polarizer infringed the Howard patent.

Once Boman was aware of Chaparral's patent rights, it had an "affirmative duty to exercise due care to determine whether or not it was infringing". *Underwater Devices, Inc.*, 717 F.2d at 1389. "This usually includes the duty to seek and obtain competent legal advice before engaging in any activity that may result in infringement." *Bott*, 807 F.2d at 1572. Although Boman sought the advice of an attorney to discuss the possible infringement, Boman has not established reliance upon any opinion of counsel with respect to validity or infringement of the Howard patent. No other evidence is offered by Boman which would support a finding that Boman exercised "due care" before deciding to continue selling EH–75 polarizers using the infringing "Probe B". These facts demonstrate that Boman could not have had any good faith belief that its "Probe B" did not infringe the Howard patent.

Boman's design is the functional equivalent of the Howard patent. Therefore, Boman's curve-shaped probe does not amount to a good faith effort to avoid infringement by designing around the Howard patent. Boman had the opportunity to change its design once it abandoned its use of the original infringing probe in December 1983. Boman's failure to change to a non-infringing design strongly supports a finding of willful infringement.

Boman's knowledge of the Howard patent, Boman's failure to determine whether or not it was infringing that patent, Boman's lack of a good faith belief concerning either the validity of the Howard patent or the non-infringement by "Probe B" of Chaparral's "Probe A", and Boman's deliberate and persistent copying of the Howard patent demonstrates that Boman's infringement was willful.

*Attorneys' Fees*

 The court may also award attorneys fees in this case because a finding of willful infringement is legally sufficient to meet the criterion of "exceptional case" under 35 U.S.C. § 285. *Kloster Speedsteel AB v. Crucible, Inc.*, 793 F.2d 1565, 1580 (Fed.Cir.1986), *cert. denied*, 479 U.S. 1034, 107 S.Ct. 882, 93 L.Ed.2d 836 (1987). Accordingly, Chaparral may be awarded attorneys' fees costs and expenses incurred in this action.

Since this action was bifurcated pursuant to Fed.R.Civ.P. 42(b), the issue of damages, attorneys' fees, and costs will be set upon the Court's calendar for trial at a time mutually convenient to the Court and the parties.